SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

NOV 13 2014

ARTHUR JOHNSTON
BY_____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION (JACKSON)

| | |
|---|---|
| TLS MANAGEMENT & MARKETING SERVICES, LLC d/b/a TAX LAW SOLUTIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> MARDIS FINANCIAL SERVICES, INC., CAPITAL PRESERVATION SERVICES, LLC, and J. TODD MARDIS, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 14-$\underline{881}$ <br><br> Hon. $\underline{CWR\text{-}FKB}$ |

## VERIFIED COMPLAINT

1.      Defendant J. Todd Mardis ("Mardis"), through his companies Mardis Financial Services, Inc. ("MFS") and Capital Preservation Services, LLC ("CPS") learned about the tax planning and consulting business while under contract with Plaintiff TLS Management & Marketing Services, LLC d/b/a Tax Law Solutions, LLC ("TLS"). Flaunting the confidentiality and non-competition restrictions of multiple agreements with TLS, as well as various Mississippi and federal laws, defendants secretly and deliberately built their own tax planning business—using TLS resources, relationships, and intellectual property—that directly competes with TLS and diverted customers from TLS to the new company, CPS. Defendants are also intentionally confusing customers about the nature and source of their services, unlawfully causing customers to believe that defendants are providing services on behalf of TLS long after defendants' relationships with TLS terminated.

2.     Defendants should not be permitted to profit from their wrongful conduct, and TLS should be made whole. Accordingly, TLS seeks compensatory damages, punitive damages, and permanent injunctive relief.

## PARTIES

3.     TLS is a limited liability company organized under the laws of Puerto Rico, with its principal place of business in Puerto Rico. None of the members of TLS are citizens of the State of Mississippi.

4.     MFS is a corporation organized under the laws of the State of Mississippi. MFS' 2014 Corporate Annual Report filed with the Mississippi Secretary of State lists its principal address as 722 Inheritance Place in Flowood, Mississippi 39232. Mardis is the Director and President of MFS.

5.     CPS is a limited liability company organized under the laws of the State of Mississippi. CPS' 2014 Annual Report filed with the Mississippi Secretary of State lists its principal address as 213 Katherine Dr. Suite A in Flowood, Mississippi 39232. CPS' 2014 Annual Report filed with the Mississippi Secretary of State indicates that CPS does not have any managers, and lists Mardis as the "contact member."

6.     Mardis resides at 722 Inheritance Place in Flowood, Mississippi 39232, and is a resident of Mississippi.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. The estimated value of the TLS projects diverted to MFS and CPS, during the time period defendants began their wrongful conduct through September 2014, as compared with historical

numbers from 2013 for the same time period, is approximately $500,000.

8.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as TLS' claim for violation of the Lanham Act presents a federal question.

9.      Venue is proper in this District because Mardis lives and works in this District, MFS and CPS have their principle offices in this District, and much of the conduct alleged in this Complaint occurred within this District.

<strong>FACTS COMMON TO ALL COUNTS</strong>

10.      TLS provides businesses with customized strategies to reduce their taxes through a group of highly skilled tax attorneys and accounting professionals.  TLS has designed custom made plans for more than 5,000 clients' businesses and individual needs, and through these efforts has developed substantial goodwill and a respected reputation in the industry.

***TLS' Trade Secret Customer and Business Information.***

11.      The identity, contact information, and knowledge of particular needs of TLS customers ("Customer Information") are essential to TLS' business, and are considered by TLS to be confidential, proprietary information.

12.      Although certain information might be publicly available—such as a company's name or corporate mailing address—only a limited number of TLS employees and affiliates know who among the general public are TLS customers or prospects, and therefore have a specific need for tax consulting services.

13.      TLS also considers information about its marketing strategies, pricing, and other business-related information ("Business Information") to be confidential and proprietary.

14.      TLS devotes significant time, effort, and capital to the development of its Customer Information and Business Information.

3

15.    For example, TLS developed a lengthy document that thoroughly assesses a client's financial information and provides recommendations of potential avenues to achieve tax savings (the "Tax Report"). TLS developed and customized the Tax Report through the full-time efforts of several individuals that began before the inception of TLS' business in 2005 and continues to this day.

16.    The Tax Report contains methods that are unique to TLS, and that are not generally available in the industry. TLS' extensive experience with regard to tax reduction is reflected in the Tax Report, TLS analytical methods, TLS forms, and TLS proposals to potential clients.

17.    TLS also devotes significant time, effort and capital to following any and all developments in tax law and policy that might affect its strategies or its clients' needs, and uses that knowledge to constantly update the Tax Report. TLS pays for subscription information services to enable TLS to stay up to date on the latest issues relevant to its tax planning advice, and employs at least one individual whose sole responsibility is to conduct and distill this research.

18.    TLS also devotes significant time, effort and capital to internal education, to enable its employees and affiliates (such as Mardis) to do their jobs well. TLS holds regular telephone conferences to update employees and affiliates on the latest developments in TLS' proprietary methods, and flies employees and affiliates to a multi-day conference once or twice a year to ensure they understand and are well-trained to execute TLS' proprietary methods.

19.    TLS employs two full-time employees devoted to marketing tasks, and invests heavily in branding and marketing efforts.

20.    TLS maintains its Customer Information and Business Information in confidence,

both to preserve TLS' competitive advantage and to meet customer expectations that TLS will maintain sensitive information (such as the amount of money TLS was able to save a client in tax payments) in confidence.[1]

21.    TLS vigilantly preserves its trade secret Customer Information and Business Information so that it does not become available to competitors who could use the data to divert customers without the investment of time, labor and capital that TLS made to compile the information.  TLS does not provide its Customer Information or Business Information to competitors.  TLS requires individuals or entities who require access to TLS' Customer Information or Business Information to sign non-disclosure, confidentiality, and non-competition agreements before providing them with such access.  Access to TLS' database containing all Customer Information is password-protected, and access permissions and methods are frequently reviewed and strictly enforced.

22.    TLS derives substantial economic value from preserving its Customer Information and Business Information as confidential and trade secret, and keeping this information out of the hands of its competitors.

### CPS, Through Mardis, Agreed To Keep TLS Information Confidential and Agreed Not to Compete With TLS.

23.    In 2010, TLS decided to involve one of its affiliates, CPS, in additional sales functions.  One of the founders of TLS had been spending significant time travelling the country to promote TLS, make presentations to potential clients, and prepare quotes.  TLS involved CPS in additional sales functions in order to free up the founders' time so they could develop new sales channels.

24.    In order to perform this enhanced role, CPS needed access to TLS' proprietary

---

[1] For this reason, customers referenced in this complaint will be referred to by their initials only.

and confidential Customer and Business Information.

25.     To that end, TLS and CPS entered into a Confidentiality and Non-Competition Agreement (the "CPS Agreement") on June 9, 2010.  A copy of the CPS Agreement is attached hereto as Exhibit A.

26.     Mardis signed the CPS Agreement on behalf of CPS.  *See* Ex. A.  Upon information and belief, Mardis was a principal and member of CPS at all applicable times.

27.     The CPS Agreement defines "TLS Associates" as all "agents, contractors, consultants, sales representatives, sales associates, subsidiaries, strategic partners, licensors, licensees, customers, prospective customers, suppliers, or other service providers" of TLS.  Ex. A at ¶ 1.2.2.

28.     In the CPS Agreement, CPS promised to keep TLS' information—including the identities of TLS Associates as well as "information regarding business methods and procedures, clients or prospective clients, agent lists, marketing channels and relationships, marketing methods, costs, prices, earnings, products, formulae, compositions, methods, systems, procedures, prospective and executed contracts and other business arrangements (collectively referred to herein as TLS' "Customer and Business Information")—confidential.  Ex. A at ¶ 1.

29.     CPS agreed that it would "make use of or disclose to others" TLS' confidential Customer and Business Information "only for the purpose of carrying out this Agreement and all other written agreements between the parties." Ex. A at ¶ 1.1.

30.     CPS also promised not to compete with TLS during the term of the Agreement and for two years after its termination:

> 2.1.  During the term of this Agreement and for a period of two years after the termination of this Agreement, [CPS] and its principal officers agree that they will not, without the prior written permission of TLS,

6

2.1.1. Become involved in the business of offering services substantially similar to any component of TLS Services, directly or indirectly, by any means whatsoever including but not limited to developing any capability internally within [CPS] or through or with any third party, creating any relationship with any third party, or making any acquisition of a company that offers TLS Services.

2.1.2. Utilize the services or advice of any TLS Associate with whom [CPS] does not currently have a relationship in any manner except for the benefit of a TLS client, nor induce or attempt to induce any TLS Associate that is not also a client of [CPS], to terminate a relationship with, cease providing services or products to, or cease purchasing products or services from, TLS.

2.1.3. Enter into any agreements with, recommend, or utilize any provider of services for legal and accounting strategies that have not been previously implemented by [CPS] for a Client of [CPS], that have been discussed with [CPS] under this Agreement or that have been recommended by TLS to any employee, client, or prospective client of [CPS] ("TLS Recommendations"), other than (1) TLS, if TLS is engaged in the business of offering or implementing such strategies, or (2) a TLS Associate, if a TLS Associate has been appointed as the provider for a particular legal or accounting strategy.

Ex. A at ¶ 2.1.

31.     TLS has not provided CPS with written permission to violate the non-competition provisions of the CPS Agreement.

32.     The initial term of the CPS Agreement was two years, and the Agreement automatically renewed for successive twelve month periods unless the parties gave timely notice of termination. Ex. A at ¶ 3.1.

33.     Neither party has provided notice of termination of the CPS Agreement to date.

34.     CPS agreed that the CPS Agreement would be binding upon its successors, heirs, and assigns. Ex. A at ¶ 4.3.

35.     CPS agreed that any violation of the CPS Agreement would result in "irreparable damage without an adequate remedy at law" and would entitle TLS to a permanent injunction. Ex. A at ¶ 4.1.1.

7

36.    CPS further agreed that, if TLS successfully obtains a permanent injunction against CPS, CPS would reimburse TLS for its attorneys' fees and costs. *Id.*

37.    CPS further agreed that, if CPS violated the Agreement with TLS, TLS would be entitled to recover "all consideration collected by [CPS] from any other party [as a result of or in relation to the breach], or any consideration to which TLS would have otherwise been entitled to receive, whichever is greater," in addition to "all other remedies at law or in equity." Ex. A at ¶ 4.1.3.

38.    TLS provided CPS and Mardis with TLS' trade secret Customer Information and Business Information pursuant to the protections of the CPS Agreement.  TLS would not have provided CPS or Mardis with its trade secret Customer and Business Information if CPS had not agreed to protect the information and to refrain from competing with TLS as required by the CPS Agreement.

39.    As a result of its relationship with TLS, CPS receives commissions on sales from TLS.  In addition, CPS receives commissions as a result of insurance policies that CPS sells to TLS clients.  The sales by CPS of insurance policies are a direct result of a TLS client's implementation of the recommendations contained in the Tax Report.  Therefore, without the TLS proprietary Customer Information, Business Information and Tax Report, TLS clients would have no reason to buy insurance policies from CPS.

***MFS, Through Mardis, Also Agreed To Keep TLS Information Confidential and Agreed Not to Compete With TLS.***

40.    On February 28, 2011, TLS and MFS entered into a Subcontractor Agreement, pursuant to which MFS became a subcontractor of TLS (the "MFS Agreement").  A copy of the MFS Agreement is attached hereto as Exhibit B.  Through the MFS Agreement, TLS significantly expanded the services it was obtaining from Mardis and CPS, beyond the sales

activities that resulted from the CPS Agreement. Specifically, through the MFS Agreement, MFS became the primary sales support office for TLS, at which time MFS became responsible for gathering Customer Information from prospective TLS clients, applying proprietary TLS Business Information to analyze the client's tax situation, and developing and pricing TLS sales proposals. In addition, MFS became responsible for production of the Tax Report, and at that time MFS was given not only the Tax Report, but all TLS methods and procedures for customizing the Tax Report to specific client situations.

41.     Mardis signed the MFS Agreement on behalf of MFS, and the Agreement specifically requires MFS to provide Mardis' services. *See* Ex. B. Upon information and belief, Mardis has served as the sole Director and President of MFS at all applicable times.

42.     In the MFS Agreement, MFS promised to keep TLS' information— "including information regarding clients or prospective clients, marketing channels and relationships, marketing methods, costs, prices, earnings, reports, products, formulae, compositions, methods, systems, procedures, reports, prospective and executed contracts and other business arrangement, and sources of supply"—confidential. Ex. B at ¶ 5. MFS acknowledged that this confidential information "shall be considered to be the confidential Intellectual Property of TLS." *Id.* at ¶ 7.2.

43.     MFS also promised not to compete with TLS during the term of the MFS Agreement and for one year after its termination:

> *Non-Competition.* During the term of this Agreement and for a period of one year after the termination of this Agreement,
>
> > 6.1. Subcontractor and its principal officers agree that they will not, without the prior written permission of TLS:
> >
> > > 6.1.1. Engage in the business of providing any tax consulting services that are packaged, sold, delivered or implemented in a manner similar to the services provided by TLS ("Consulting

9

Services");

6.1.2. Be employed by, act as an agent for, or consult with or otherwise perform services for, any individual or business entity that is directly or indirectly engaged, or is preparing to engage, in the business of providing services similar to Consulting Services (a "Competitor of TLS");

6.1.3. Own any equity interest in, manage or participate in the management (as an officer, director, partner, member or otherwise) of, or be connected in any manner with, a Competitor of TLS, except that this shall not restrict Subcontractor or its principal officers from owning less than one percent (1%) of the equity of any publicly held entity;

6.1.4. Induce or attempt to induce any employee, officer, director, agent, independent contractor, Consultant, representative, strategic partners, licensor, licensee, Client, supplier, TLS Affiliate, or other service provider of TLS (collectively "TLS Resources") to terminate a relationship with, cease providing services or products to, or cease purchasing products or services from, TLS; or

6.1.5. Hire, induce to hire, or directly or indirectly engage the services of any TLS Resource, whether as an employee, contractor, partner in a partnership, or employee or contractor of any business entity in which Subcontractor has a management or ownership interest, that provided services to TLS.

Ex. B at ¶ 6.

44.     The initial term of the MFS Agreement was two years, and the Agreement automatically renewed for successive twelve month periods unless the parties gave timely notice of termination. Ex. B at ¶ 8.2.

45.     MFS agreed that, upon termination of the MFS Agreement, it "shall return to TLS any Intellectual Property of TLS still in [its] possession." Ex. B at ¶ 8.4.2.

46.     MFS agreed that it would pay TLS' attorneys' fees if TLS prevailed in a lawsuit alleging breach of contract against MFS. Ex. B at ¶ 9.2.1.

47.     MFS also agreed that, if it violated the Agreement, TLS would be entitled to:

10

      (a)     150% of all fees collected by MFS in relation to products or services sold as a result of any breach or use of TLS Intellectual Property; and

      (b)     150% of any fees collected by MFS in relation to services which TLS could have provided and would have been entitled to receive compensation but for MFS' breach of contract.

Ex. B at ¶ 9.2.2.

48.     MFS agreed that the MFS Agreement would be binding upon its successors, heirs, and assigns. Ex. B at ¶ 9.5.

49.     The MFS Agreement was jointly prepared by both parties, each of which was a sophisticated business. Accordingly, the parties agreed that "no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions in th[e] Agreement." Ex. B at ¶ 9.15.

50.     TLS provided MFS and Mardis with its trade secret Customer Information and Business Information so that MFS and Mardis could perform their duties and obligations under the MFS Agreement.

51.     MFS and Mardis were handsomely compensated for their work under the MFS Agreement. Ex. B at ¶ 4. MFS and Mardis were also compensated through insurance commissions earned as a direct result of the MFS Agreement. In fact, Mardis earned more income on each account under the MFS Agreement than TLS did, taking into account commissions received by Mardis from TLS, and commissions received by Mardis on the sale of insurance policies. From February 2011 through September 2014, the total compensation received by MFS and Mardis through or as a direct result of the MFS Agreement was approximately $2,100,000. This is comprised of fees paid directly by TLS to MFS of $547,000,

and insurance commissions earned by MFS and Mardis of approximately $1,400,000 on information and belief. In addition to the $547,000 in fees paid directly by TLS to MFS and Mardis, TLS also paid MFS and Mardis for office space including rent, utilities and maintenance of $16,000, assumed the expenses of an employee/affiliate of MFS and Mardis at a cost of $48,000, and reimbursed $71,000 of Mardis' travel and related expenses between February 2011 and September 2014.

***Mardis Expressed An Interest In Investing In TLS, and Received Additional Confidential Information On That Basis.***

52.    In 2013, MFS and Mardis expressed an interest in potentially purchasing an ownership interest in TLS.

53.    Certain provisions of the MFS Agreement were amended in recognition of this interest. A copy of the Amendments are attached hereto as Exhibit C.

54.    The amendments to the MFS Agreement confirmed the importance and necessity of Mardis' services, requiring that Mardis "focus his primary full-time efforts and attention on TLS." Ex. C at ¶ 1. The amendments also gave Mardis "line management authority over all aspects of TLS' consulting division." *Id.*

55.    The amendments specifically noted that the provisions of the original MFS Agreement discussed above "shall remain in full force and effect." Ex. C at ¶ 4.

56.    TLS provided Mardis significant access to its confidential Customer and Business Information, in order to permit Mardis to determine whether or not he wanted to purchase an ownership interest in TLS.

57.    Notably, Mardis asked for and received information about TLS' financial and business operations, including TLS' business profitability and external relationships. While much of this information would have only marginal connection to Mardis' potential interest in

12

purchasing an ownership interest in TLS, it would be of significant use to an individual attempting to establish a competing enterprise.

58.     Mardis and TLS attempted to negotiate a deal over a period of many months, but Mardis either objected to, or failed to honor, each proposed deal point.  The discussions eventually came to an end with the sudden termination of the MFS Agreement by Mardis, even though TLS had been provided with ongoing assurance by Mardis—including in discussions that occurred as recently as two weeks prior to Mardis' termination of the MFS Agreement—that Mardis had accepted the offer from TLS to purchase options in TLS.

***Defendants' Wrongful Conduct..***

59.     MFS and Mardis terminated the MFS Agreement with TLS on September 26, 2014.  The CPS Agreement has never been terminated, and remains in effect to this day.

60.     Although defendants were generally good salesmen, they delivered an unusually small number of sales to TLS during the spring and summer of 2014.  Upon information and belief, defendants were diverting sales opportunities away from TLS to competitors during the spring and summer of 2014.

61.     Defendants have engaged in multiple efforts to sell tax planning services on behalf of CPS.  Some of these efforts occurred prior to the termination of the MFS Agreement, and while Mardis and MFS were being paid by TLS for Mardis' full-time efforts and attention.

62.     CPS competes with TLS in the market for income tax reduction consulting services.  Mardis is a member of CPS and, on information and belief, has a substantial ownership interest in CPS.

63.     For example, Mardis attended conferences and trade shows in the summer of 2014, including two conferences in Florida in approximately July and August 2014, at which he

solicited doctors for tax planning services. Travel and related expenses for those conferences were not submitted by Mardis to TLS for reimbursement, and upon inquiring as to why these expenses were not submitted for reimbursement, TLS was informed that Mardis "was not representing TLS at these conferences." However, Mardis was falsely representing to TLS that he was soliciting leads on behalf of TLS.

64.     While under contract with TLS for his "primary full-time efforts and attention," Mardis negotiated a contract with the Mississippi State Medical Association ("MSMA") to offer tax planning services to all of its members, which consist of most of the doctors in the state of Mississippi. However, Mardis diverted that contract from TLS to CPS, and CPS then began openly soliciting all MSMA members for the tax planning services being offered by CPS, rather than by TLS. Mardis told a TLS employee not to tell TLS about the deal, "because they'll want a piece of it."

65.     Defendants have also diverted business from TLS referral sources, strategic partners, and/or affiliates—such as financial advisor V.V. and tax advisor T.K.—to CPS. Despite diverting the business to CPS, Mardis represented to V.V. and T.K. that the business was still going through TLS. V.V. and T.K. were shocked to learn that the business they referred to TLS was in fact being done by CPS.

66.     Mardis attempted to induce a TLS employee, Demrie Henry, to either leave TLS to work for CPS in August 2014 or to divert clients from TLS to CPS while still working for TLS, promising her 50% of the commissions for such referrals.

67.     Upon information and belief, MFS failed to return to TLS all TLS Confidential Information in its possession after the termination of the MFS Agreement.

68.     Upon information and belief, defendants are in possession of TLS' Confidential

Information, and continue to use it for the benefit of competitor CPS to divert business away from TLS.

69. As President of MFS, Mardis is a "principal officer" of MFS.

70. As the only listed "member" of CPS, Mardis is also a "principal officer" of CPS.

71. Mardis and CPS are engaging in the business of providing tax consulting services similar to those provided by TLS and performing services for a competitor of TLS.

72. Mardis also owns an equity interest in a competitor of TLS in violation of paragraph 6 of the MFS Agreement.

73. Defendants are also attempting to induce TLS referral sources and current TLS clients to direct business to CPS rather than to TLS. For example, Mardis was introduced to referral source J.B. and client T.C. and her business advisor J.V. through TLS. Before the MFS Agreement was terminated, Mardis arranged for TLS to handle a project for T.C. in which her business advisor J.V. was directly involved. J.V. is planning to expand his business, and introduce TLS to those relationships. Since the termination of the MFS Agreement, Mardis has attempted to induce J.V. to give that work to CPS instead of TLS.

74. TLS and its business partners have provided services to clients of TLS affiliate and sales partner Addicus, whose principals are themselves clients of TLS, and who are under confidentiality and non-competition agreements with TLS. Mardis and CPS have solicited Addicus to assist CPS in developing capabilities that compete with TLS.

***Defendants Are Intentionally Confusing Customers About The Source of Their Services.***

75. Shockingly, defendants are intentionally confusing customers about the nature and source of their services, causing customers to believe that defendants' services are provided through or on behalf of TLS.

76.     Defendants obtained permission from customers to use their names to endorse TLS services, then used the customers' names and comments to promote CPS services causing TLS customers significant confusion, frustration, and anger.

77.     In one particularly egregious instance, Mardis and CPS used a positive comment customer D.H. had made regarding services performed by TLS in a flyer promoting CPS' services that was sent to all members of the Mississippi State Medical Association – nearly all of the physicians in the State.  In the CPS flyer, Mardis and CPS included private financial information of D.H. without his permission.  Mardis and CPS also included the name of a specific physician group without D.H.'s or the group's permission.  D.H. immediately contacted TLS to complain, concerned that his information was used without his permission and that the advertisement would result in an audit from the IRS.  D.H. did not understand that his endorsement was being used not for TLS but for a competitor of TLS.

78.     Mardis and CPS also used the name and quotes from another TLS customer, C.H., on the CPS website without the customer's permission.  Although the customer provided the quote to endorse TLS, Mardis and CPS falsely represented on the CPS website that the customer was endorsing CPS' services.  Upon information and belief, C.H. has never used the services of CPS.  CPS later removed C.H.'s name and quote from its website upon C.H.'s demand.

79.     Mardis and CPS have also failed to inform clients who they began soliciting while Mardis was still associated with TLS, that any work on their projects is now being done by CPS – a completely separate entity and a competitor of TLS.  These customers have reported being shocked to learn that their projects were not being handled by TLS.

80.     Defendants' efforts to confuse customers about the origin or source of their services, and their nonexistent connection to TLS, has caused and continues to cause irreparable

harm to TLS' reputation and goodwill.

81.     Faced with defendants' recent, bold, and open violations of the CPS and MFS Agreements as well as Mississippi and federal law, TLS is forced to bring this action to enjoin defendants from further unlawful conduct.  TLS also seeks compensatory and punitive damages for defendants' wrongful conduct.

82.     The estimated value of the TLS projects diverted to MFS and CPS during the time period defendants began their wrongful conduct through September 2014 is approximately $500,000 based on historical numbers from the same time period.  Furthermore, the amount of revenue diverted to MFS and CPS will likely be substantially greater than $500,000 in 2014, because nearly 50% of TLS' historical annual gross revenues of $2,000,000 is earned in the fourth quarter as a result of sales efforts during all prior quarters.

## FIRST CAUSE OF ACTION
### Breach of Contract Against Capital Preservation Services, LLC

83.     The allegations of paragraphs 1 through 82 are incorporated herein by reference with the same force and effect as if set forth in full below.

84.     The CPS Agreement, together with the amendments thereto, is a valid contract supported by adequate consideration.

85.     TLS complied with all of its obligations under the CPS Agreement.

86.     CPS breached the CPS Agreement by the above-described conduct.

87.     Pursuant to paragraph 1 of the CPS Agreement, CPS agreed to keep TLS Customer and Business Information confidential.  CPS breached paragraph 1 of the CPS Agreement by disclosing TLS Customer and Business Information to third-parties, and by using the information to compete against TLS.

88.     Pursuant to paragraph 2.1 of the CPS Agreement, CPS agreed not to compete with

17

TLS during the term of the Agreement and for two years after its termination. CPS breached paragraph 2.1 of the CPS Agreement by, among other things, competing with TLS, by attempting to induce TLS Associates to terminate their relationship with TLS, and by attempting to induce TLS employees to terminate their relationship with TLS.

89.     CPS continues to violate its contractual obligations, and will continue to violate these obligations in the future absent court intervention. Unless CPS is permanently enjoined from the foregoing conduct, TLS will continue to suffer unlawful disclosure and use of its confidential information as well as loss of customer goodwill.

90.     As a consequence of CPS' breaches of the CPS Agreement, TLS has suffered significant damages.

**SECOND CAUSE OF ACTION**
**Breach of Contract Against Mardis Financial Services, Inc.**

91.     The allegations of paragraphs 1 through 90 are incorporated herein by reference with the same force and effect as if set forth in full below.

92.     The MFS Agreement, together with the amendments thereto, is a valid contract supported by adequate consideration.

93.     TLS complied with all of its obligations under the MFS Agreement.

94.     MFS breached the MFS Agreement by the above-described conduct.

95.     Pursuant to paragraph 5 of the MFS Agreement, MFS agreed to keep TLS Customer and Business Information confidential. MFS breached paragraph 5 of the MFS Agreement, both before and after termination, by disclosing TLS Customer and Business Information to third parties, and using the information to compete against TLS.

96.     Pursuant to paragraph 6 of the MFS Agreement, MFS agreed not to compete with TLS during the term of the Agreement and for one year after its termination. MFS breached

18

paragraph 6 of the MFS Agreement by, among other things, competing with TLS both before and after the termination, and by attempting to induce TLS employees to terminate their relationship with TLS.

97.     Pursuant to paragraph 8.4.2 of the MFS Agreement, MFS agreed to return to TLS any TLS Customer or Business Information in its possession at the time of termination.  Upon information and belief, MFS has not done so, and therefore is also in breach of paragraph 8.4.2.

98.     Paragraph 1 of the Amendments to the MFS Agreement required MFS to provide the services of Mardis, and to ensure that he devoted "his primary full-time efforts and attention on TLS." Ex. C at ¶ 1.  MFS breached this provision by permitting Mardis to engage in sales efforts on behalf of TLS competitors, and by permitting Mardis to divert TLS opportunities to competitors.

99.     MFS continues to violate its contractual obligations, and will continue to violate these obligations in the future absent court intervention.  Unless MFS is permanently enjoined from the foregoing conduct, TLS will continue to suffer unlawful disclosure and use of its confidential information as well as loss of customer goodwill.

100.    As a consequence of MFS' breaches of the MFS Agreement, TLS has suffered significant damages.

### THIRD CAUSE OF ACTION
**Breach of Contract Against J. Todd Mardis**

101.    The allegations of paragraphs 1 through 100 are incorporated herein by reference with the same force and effect as if set forth in full below.

102.    The CPS and MFS Agreements, together with all amendments thereto, are valid contracts supported by adequate consideration.

103.    TLS complied with all of its obligations under the CPS Agreement and the MFS

Agreement.

104. Mardis signed the CPS Agreement on behalf of CPS. At all relevant times, Mardis was a member and principal of CPS.

105. Mardis signed the MFS Agreement on behalf of MFS. At all relevant times, Mardis was the President and a Director (perhaps the only Director) of MFS.

106. The MFS Agreement, together with its amendments, specifically required Mardis to devote "his primary full-time efforts and attention on TLS." Ex. C at ¶ 1.

107. Mardis breached the MFS Agreement by failing to devote his primary full-time efforts and attention on TLS. As explained in detail above, Mardis engaged in sales efforts on behalf of TLS competitors and diverted TLS opportunities to competitors.

108. The non-competition provisions of the CPS Agreement and the MFS Agreement expressly apply to CPS' and MFS' "principal officers." Ex. A at ¶ 2.1; Ex. B at ¶ 6. As the President and Director of MFS and a member of CPS, Mardis was a principal officer of both CPS and MFS and is therefore bound by the Agreements' non-competition provisions.

109. Mardis violated the non-competition provisions of the CPS Agreement and the MFS Agreement by, among other things, engaging in the business of providing tax consulting services similar to those provided by TLS on behalf of a competitor, performing services on behalf of a competitor of TLS, owning an equity interest in and serving as a member of a competitor of TLS, inducing or attempting to induce employees or other persons affiliated with TLS to terminate their relationship with or violate their obligations to TLS, and attempting to induce TLS Associates to terminate their relationship with TLS.

110. Mardis continues to violate his contractual obligations, and will continue to violate these obligations in the future absent court intervention. Unless Mardis is permanently

20

enjoined from the foregoing conduct, TLS will continue to suffer unlawful disclosure and use of its confidential information as well as loss of customer goodwill.

111.   As a consequence of Mardis' breaches of the CPS Agreement and the MFS Agreement, TLS has suffered significant damages.

### FOURTH CAUSE OF ACTION
### Violation of the Mississippi Uniform Trade Secrets Act Against All Defendants

112.   The allegations of paragraphs 1 through 111 are incorporated herein by reference with the same force and effect as if set forth in full below.

113.   The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Defendants under the Mississippi Uniform Trade Secrets Act, Miss. St. §§ 75-26-1, *et seq.*

114.   TLS provided defendants with confidential Customer Information and Business Information pursuant to specific provisions safeguarding the confidentiality of the information and only for the purpose of furthering specific business activities.

115.   TLS developed its Customer and Business Information through a substantial investment of time, money and effort, as detailed above.

116.   TLS' Customer and Business Information is not generally known, and is not readily ascertainable by proper means.

117.   TLS derives a significant economic and competitive advantage in the tax consulting services industry from maintaining the secrecy and confidentiality of its Customer and Business Information.

118.   TLS' Customer and Business Information is subject to reasonable efforts by TLS to maintain its secrecy and/or confidentiality, as detailed above.

119.   Accordingly, TLS' Customer Information and Business Information constitute

trade secrets under Mississippi law. *See* Miss. Stat. § 75-26-3(d).

120.   Defendants, and each of them, have improperly and without authorization misappropriated, acquired, retained, disclosed, used, and exploited TLS' trade secrets, including TLS' Customer and Business Information, for the purposes of diverting opportunities from TLS to other competitors.

121.   Defendants' continued retention, disclosure and use of TLS' trade secret Customer and Business Information, as alleged herein, constitutes actual and threatened misappropriation of trade secrets. *See* Miss. Stat. § 75-26-3(b).

122.   Defendants' misappropriation of TLS' trade secrets is willful and malicious.

123.   As a consequence of defendants' misappropriation of TLS' trade secrets, TLS has suffered significant damages.

124.   The Mississippi Uniform Trade Secrets Act expressly provides for injunctive relief to protect against ongoing acts of misappropriation as well as threatened misappropriation. Miss. Stat. § 75-26-5.

125.   The Mississippi Uniform Trade Secrets Act entitles a claimant to recover attorneys' fees and punitive damages, in addition to compensatory damages, where willful and malicious misappropriation occurred. Miss. Stat. §§ 75-26-7, 75-26-9.

## FIFTH CAUSE OF ACTION
### Violation of the Lanham Act Against Capital Preservation Services, LLC

126.   The allegations of paragraphs 1 through 125 are incorporated herein by reference with the same force and effect as if set forth in full below.

127.   CPS has distributed advertisements and posted pages on its website which include false and misleading representations of fact.

128.   For example, CPS has distributed advertisements in the form of flyers mailed to

all members of the Mississippi State Medical Association—essentially all physicians in the State—which include a purported quotation from D.H. endorsing CPS' services. The statement is false, as is the representation that D.H. endorses CPS' services, because D.H. has never utilized CPS' services. Instead, D.H. was a customer of TLS and was extremely unhappy when he learned that CPS was claiming that he endorsed their services. The advertisement containing the false representation of endorsement by D.H. is likely to cause confusion as to whether or not D.H. endorses CPS' services, and misrepresents the characteristics or qualities of CPS' services.

129. CPS also posted on its website's "testimonials" page, for some period of time, a purported quotation from C.H. endorsing CPS' services. The statement is false, as is the representation that C.H. endorses CPS' services, because C.H. has never utilized CPS' services. Instead, C.H. was a customer of TLS and was shocked to learn that CPS was claiming that he endorsed their services. The webpage containing the false representation of endorsement by C.H. was used by CPS to market CPS' services to a worldwide audience via the internet. The false representation is likely to cause confusion as to whether or not C.H. endorses CPS' services, and misrepresents the characteristics or qualities of CPS' services.

130. CPS has also repeatedly failed to inform customers that Mardis is now soliciting work on behalf of CPS (and not TLS). Long-time customers and affiliates of TLS have been surprised and upset to learn that their projects are not being handled by TLS, but by a competitor unknown to them.

131. CPS' advertisements and website content constitute commercial speech.

132. CPS' statements described above were literally false.

133. In the alternative, if the statements were not literally false, they convey a false impression and are misleading in context.

23

134.    CPS' false statements had the capacity to deceive TLS customers, and concerned subjects at the heart of customers' decisions about who to trust with their important financial decisions.

135.    CPS' false statements have caused irreparable harm to TLS' goodwill and its customer relationships, as detailed above.

136.    TLS has been and will continue to be damaged by CPS' false advertising and false designation of the origin of their services.

137.    The Lanham Act provides for injunctive relief, as well as an award of defendants' profits, compensatory damages, and costs.  In exceptional cases, the court may also award reasonable attorneys' fees.  15 U.S.C. §§ 1116(a), 1117(a).

## SIXTH CAUSE OF ACTION
### Tortious Interference With Business Relations Against All Defendants

138.    The allegations of paragraphs 1 through 137 are incorporated herein by reference with the same force and effect as if set forth in full below.

139.    As described in greater detail above, defendants tortiously interfered with TLS' business relations by unlawfully diverting prospective customers away from TLS to CPS.

140.    Defendants' tortious interference was intentional and willful, and was designed to cause damage to TLS in its lawful business.

141.    Defendants' intentional and willful interference was malicious, and was not justifiable.

142.    TLS has been and will continue to be damaged by defendants' tortious interference with TLS' business relations.

24

## SEVENTH CAUSE OF ACTION
### Unfair Competition Against All Defendants

143.   The allegations of paragraphs 1 through 142 are incorporated herein by reference with the same force and effect as if set forth in full below.

144.   Defendants' conduct, described in greater detail above, also constitutes common law unfair competition.

145.   Defendants intentionally, willfully, and in bad faith misappropriated the labors and expenditures of TLS for their own benefit, or for the benefit of a competitor of TLS. Defendants engaged in false advertising, deception, and abuse of a confidential relationship in so doing.

146.   As a consequence of defendants' unfair competition, TLS has suffered significant damages.

## PRAYER FOR RELIEF

For the reasons set forth above, TLS respectfully requests that this Court enter an order and judgment in its favor as follows:

A.   Permanently enjoining CPS from directly or indirectly engaging in or offering services substantially similar to any component of the tax analysis, tax planning, and related implementation services offered by TLS, utilizing the services or advice of any TLS Associate with whom CPS did not have a preexisting relationship before June 2010, inducing or attempting to induce any TLS Associates to terminate a relationship with TLS or cease providing services to TLS, and entering into any agreements with or recommending any provider of services for legal and accounting strategies other than TLS to any client or prospective client;

B.   Permanently enjoining MFS and Mardis from engaging in tax consulting services,

25

performing tax consulting services for a competitor of TLS, owning any equity interest in or being a member of a competitor of TLS, inducing or attempting to induce TLS employees or affiliates to terminate their relationship with TLS, or hiring any TLS employee or affiliate until September 27, 2015 at the earliest;

C.  Permanently enjoining MFS, Mardis and anyone acting in concert with them from using, disclosing, transmitting, or continuing to possess for any purpose TLS' Customer Information and Business Information;

D.  Ordering MFS, Mardis, and anyone acting in concert with them to return to TLS any and all records and/or documents in any form pertaining to TLS' Customer Information or Business Information;

E.  Awarding TLS compensatory and actual damages;

F.  Awarding TLS punitive or exemplary damages;

G.  Requiring defendants, jointly and severally, to reimburse TLS for its reasonable attorneys' fees and costs in bringing and pursuing this action; and

H.  Granting such other and further relief as the Court deems just and proper.

DATED:  November 13th, 2014.

SCOTT, SULLIVAN, STREETMAN & FOX, P.C.

JAMES P. STREETMAN, III
Of Counsel for Plaintiff TLS Management & Marketing
Services, LLC d/b/a Tax Law Solutions, LLC

26

**OF COUNSEL:**
**SCOTT, SULLIVAN, STREETMAN & FOX, P.C.**
James P. Streetman, III (MSB # 7973)
Leah N. Ledford (MSB # 101394)
725 Avignon Drive
Ridgeland, MS 39157
P.O. Box 13847
Jackson, MS 39236-3847
(601) 607-4800 (Telephone)
(601) 607-4801 (Facsimile)
jstreetman@sssf-ms.com
lledford@sssf-ms.com