**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**TLS MANAGEMENT MARKETING**                              **PLAINTIFF**
**SERVICES, LLC**

**V.**                                              **CAUSE NO. 3:14-CV-00881-CWR-LRA**

**MARDIS FINANCIAL SERVICES, INC.,**                        **DEFENDANTS**
**ET AL.**

## ORDER

Before the Court is the Defendants' motion for judgment on the pleadings.  Docket No. 48.  The motion has been fully briefed and is ripe for adjudication.  Having reviewed the applicable law and the parties' arguments, the Court is ready to rule.

**I.      Factual and Procedural History**

Plaintiff TLS Management & Marketing Services, LLC provides clients with strategies for reducing their taxes.  On June 9, 2010, TLS hired Capital Preservation Services, LLC to perform sales functions on its behalf.  TLS required CPS, through its founder Todd Mardis, to sign a Confidentiality and Non-Competition Agreement (the "CPS Agreement") before allowing access to TLS's customer and business information.

On February 28, 2011, TLS entered into a similar Subcontractor Agreement (the "MFS Agreement") with Mardis Financial Services, Inc. before employing MFS as its primary sales support office.  The MFS Agreement was amended in 2013 when Mardis expressed an interest in purchasing an ownership stake in TLS, giving him authority over TLS's consulting division.  Consequently, he was given more access to TLS's customer and business information.

Mardis and TLS were never able to negotiate a deal for an ownership option, and the negotiations ended in the sudden termination of the MFS Agreement on September 26, 2014. TLS, however, alleges that the CPS Agreement is still in effect.

On November 13, 2014, TLS filed suit against Mardis, CPS, and MFS asserting that they had breached their contracts.  Docket No. 1.  The complaint specifically alleges that the Defendants used confidential information to compete with and divert sales opportunities away from TLS during the spring and summer of 2014.

The Defendants sought to have the case dismissed (or in the alternative, stayed), pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that TLS had not obtained a certificate of authority from the Mississippi Secretary of State in order to do business in Mississippi and therefore could not maintain this action.  Docket No. 10 (citing Miss. Code Ann. § 79-4-15.02). After holding a hearing, the Court denied the motion.  *See* Text-Only Order of Dec. 17, 2015. The Court then entered a Case Management Order setting forth the various deadlines and permitting the parties to begin discovery.  Docket No. 32.

Since the entry of the Case Management Order, the parties have engaged in multiple skirmishes that the Magistrate Judge has been called upon to referee.  Those discovery battles have ensued and escalated in large part because of the pending motion for judgment on the pleadings filed by the Defendants pursuant to Federal Rule of Civil Procedure 12(c).  At the heart of the motion, the Defendants contest the enforceability of the restrictive covenants detailed in the agreements.  Docket No. 48.[1]

The relevant provisions of the CPS agreement are as follows:

---

[1] Generally, parties are prohibited from making successive Rule 12 motions, but "this prohibition does not apply to a motion for judgment on the pleadings based on a failure to state a claim on which relief can be granted."  *Bass v. Hirschbach Motor Lines, Inc.*, No. 3:14-CV-360-TSL-JCG, 2014 WL 5107594, at *2 n.2 (S.D. Miss. Oct. 10, 2014) (citation omitted).

1. *Confidentiality.*

1.1. Except as authorized in advance in writing, during the term of this Agreement and for a period of two years after the termination of this Agreement, TLS and Advisor will make use of or disclose to others the Confidential Information of the other Party only for the purpose of carrying out this Agreement and all other written agreements between the Parties.

1.2.1.  For purposes of this Agreement, the term "Confidential Information" shall include, without limitation, all of the following:

1.2.1.  All information regarding the Parties' business, whether written or otherwise and whether or not it is marked "confidential", "proprietary", or "copyright" at the time of disclosure, including information regarding business methods and procedures, clients or prospective clients, agent lists, marketing channels and relationships, marketing methods, costs, prices, earnings, products, formulae, compositions, methods, systems, procedures, prospective and executed contracts and other business arrangements, forecasts, financial statements, technical information, and business plans;

1.2.2.  The identities of agents, contractors, consultants, sales representatives, sales associates, subsidiaries, strategic partners, licensors, licensees, customers, prospective customers, suppliers, or other service providers or sources of supply including firms in which a principal, employee, officer, director or owner of either Party may have an ownership interest (collectively, "Associates");

1.2.3.  TLS reports and any information contained therein, related work products including implementation documents, and any other information provided to Advisor or its clients by TLS or TLS Associates, by or in connection with proposing or delivering TLS Services (individually or collectively, "TLS Plans");

1.3.  For purposes of this Agreement, the term "Confidential Information" shall not include: (a) information disclosed by one Party with the prior written consent of the other Party, (b) information that has been previously disclosed  by the other Party to the general public, (c) information that has been previously obtained by the other Party from public sources, (d) information that is required to be disclosed pursuant to a valid judicial court order, but only to the extent of and for the purpose of such order, and only if the Party receiving such order (the "Receiver") provides timely notice of such order to the other Party and cooperates reasonably with the other Party's efforts to contest or limit the scope of such order.

2. *Noncompetition.*

2.1.  During the term of this Agreement and for a period of two years after the termination of this Agreement, Advisor and its principal officers agree that they will not, without the prior written permission of TLS,

2.1.1.  Become involved in the business of offering services substantially similar to any component of TLS Services, directly or indirectly, by any means whatsoever including but not limited to developing any capability internally within Advisor or through or with any third party, creating any relationship with any third party, or making any acquisition of a company that offers TLS Services.

2.1.2.  Utilize the services or advice of any TLS Associate with whom Advisor does not currently have a relationship in any manner except for the benefit of a TLS client, nor induce or attempt to induce any TLS Associate that is not also a client of Advisor, to terminate a relationship with, cease providing services or products to, or cease purchasing products or such strategies, or (2) a TLS Associate, if a TLS Associate has been appointed as the provider for a particular legal or accounting strategy services from, TLS;

2.1.3.  Enter into any agreements  with, recommend, or utilize any provider of services for legal and accounting   strategies that have not been previously implemented by Advisor for a Client of Advisor, that have been discussed with Advisor  under this Agreement  or that have been recommended by TLS to any employee, client, or prospective client of Advisor (""TLS Recommendations"), other than (1) TLS, if TLS is engaged in the business of offering or implementing such strategies, or (2) a TLS Associate, if a TLS Associate has been appointed as the provider for a particular legal or accounting strategy.

Docket No. 1-2.  The relevant provisions of the MFS Agreement are as follows:

5. Confidentiality. Except as authorized in writing, neither Subcontractor nor TLS will, at any time during or after the termination of this Agreement, directly or indirectly disclose to others any confidential information of the other Party. During the term of this Agreement, the Parties may only use confidential information of the other Party for a purpose that is necessary in carrying out the provisions of this Agreement. Further, the Parties may not make use of or disclose any confidential information of the other Party after the termination of this Agreement. All information, whether written or otherwise, regarding the Parties' business, including information regarding clients or prospective clients, marketing channels and relationships, marketing, methods, costs prices, earnings, reports, products, formulae, compositions, methods, systems, procedures, reports, prospective and executed contracts and other business arrangements, and sources of supply, whether or not such information when conveyed to the other Party was indicated as being, or was marked as being, confidential or proprietary at the time such information is conveyed, is deemed to be Confidential Information of each of the Parties for purposes of this Agreement, except to the extent that such information may be otherwise lawfully and readily available to the general public. The Parties shall promptly notify each other if either Party becomes aware of the possibility that disclosure of Confidential Information has occurred or could potentially occur, as

a result of the actions or inactions of any other party including an agent, employee, representative; TLS Affiliate, or Client.

6. *Non-Competition.* During the term of this Agreement and for a period of one year after the termination of this Agreement,

6.1. Subcontractor and its principal officers agree that they will not, without the prior written permission of TLS:

6.1.1. Engage in the business of providing any tax consulting services that are packaged, sold, delivered or implemented in a manner similar to the services provided by TLS ("Consulting Services");

6.1.2. Be employed by, act as an agent for, or consult with or otherwise perform services for, any individual or business entity that is directly or indirectly engaged, or is preparing to engage, in the business of providing services similar to Consulting Services (a "Competitor of TLS");

6.1.3. Own any equity interest in, manage or participate in the management (as an officer, director, partner, member or otherwise) of, or be connected in any manner with, a Competitor of TLS, except that this shalt not restrict Subcontractor or its principal officers from owning less than one percent (1%) of the equity of any publicly held entity;

6.1.4. Induce or attempt to induce any employee, officer, director, agent, independent contractor, Consultant, representative, strategic partner, licensor, licensee, Client, supplier, TLS Affiliate, or other service provider of TLS (co11ectively, "TLS Resources") to terminate a relationship with, cease providing services or products to, or cease purchasing products or services from, TLS; or

6.1.5. Hire, induce to hire, or directly or indirectly engage the services of any TLS Resource, whether as an employee, contractor, partner in a partnership, or employee or contractor of any business entity in which Subcontractor has a management or ownership interest, that provided services to TLS.

Docket No. 1-3.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(c) allows the Court to enter judgment on the

pleadings alone.  Fed. R. Civ. P. 12(c).

The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss.  The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.  The plaintiff must plead enough facts to state

> a claim to relief that is plausible on its face.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (quotation marks and citations omitted).  "[J]udgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain."  *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 422 (5th Cir. 2001).

## III.  Discussion

The Defendants assert that the breach of contract claims should be dismissed on the pleadings because the CPS and MFS agreements are unenforceable as a matter of law.  Docket No. 55.

Both agreements are governed by Illinois law pursuant to a choice of law provision contained in each.  Docket Nos. 53; 55.  Illinois courts assess the enforceability of restrictive covenants under a reasonableness standard.  *See Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 397 (Ill. 2011).  "A restrictive covenant . . . is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public."  *Id.*  "[W]hether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case."  *Id.* at 404.

Due to the fact-dependent nature of this inquiry, the Plaintiff argues that it is improper to dismiss the claims at the Rule 12(c) stage without the benefit of discovery.  Docket No. 53.  The Defendants counter that Illinois courts will invalidate restrictive covenants before developing the facts if "the covenant is patently unreasonable."  *See Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1110 (N.D. Ill. 2016); Docket No. 55.  They contend that the

confidentiality, non-competition, and non-solicitation provisions contained in both agreements are facially invalid as a matter of law.  Docket Nos. 49; 55.

###### A.       The Validity of the Confidentiality Provisions

The Defendants claim that the confidentiality provisions are facially invalid because they lack durational *and* geographic limitations.  Docket No. 55.  Relying on *Cincinnati Tool Steel Co. v. Breed,* 482 N.E.2d 170, 175 (Ill. App. Ct. 1985), they argue that "durational **and** geographic[] limitations are required for a confidentiality agreement to be enforceable."  *See* Docket No. 55, at 2.  But the *Breed* Court did not state that much.  It simply recognized that, at that time, Illinois courts "ha[d] not enforced a covenant without at least a durational restriction, a geographic restriction[,] *or* a limitation on the parties to whom the employee is prohibited from disclosing information."  *Breed*, 482 N.E.2d at 175 (emphasis added).[2]  Because the covenant at issue in that case contained neither, the court found it to be unreasonable.  *Id.*

A stark difference between *Breed* and the instant case is that *Breed* was not before the court on a Rule 12(c) motion.  The court was reviewing the denial of a preliminary injunction and had before it testimony from hearings conducted on the matter.  *Id.* at 172-73.  Moreover, the confidentiality provision in the CPS agreement, unlike the provision in *Breed*, contains a durational limitation of two years after termination, though it lacks a geographic limitation.  Docket No. 1-2.

While the MFS provision has neither of the two restrictions, this absence does not conclusively render it "patently unreasonable" on its face.  In *Coady v. Harpo, Inc.*, 719 N.E.2d

---

[2] The Defendants also cite the more recent case of *Fleetwood Packaging v. Hein*, No. 14 C 09670, 2015 WL 6164957, at *7 (N.D. Ill. Oct. 20, 2015), for the proposition that durational and geographic limitations are required for confidentiality agreements to be enforceable, except where trade secrets are involved.  Docket No. 55, at 4 n.3. However, the court in *Hein* relied solely on *Breed* in making that ruling.  And like the Defendants, the court in *Hein* read more into the *Breed* Court's opinion than was expressed.

244, 250 (Ill. App. Ct. 1999), the court found the plaintiff's argument "that the confidentiality agreement [was] too broad because it remains effective for all time and with no geographic boundaries" unpersuasive due to the nature of the defendant's business interests.[3]  Here, the Defendants are urging the Court to do the opposite by invalidating the confidentiality provisions for lack of durational and geographic limitations without considering the nature of the Plaintiff's legitimate business interests.  The Court declines to do so.

The Defendants further contend that the confidentiality provisions attempt to protect all information concerning TLS's business regardless of whether it is actually confidential and are, therefore, patently overbroad.  Docket No. 55.[4]  They rely on two Illinois cases to support this contention.

In *AssuredPartners, Inc. v. Schmitt*, 44 N.E.3d 463, 475-76 (Ill. App. Ct. 2015), the court found a confidentiality provision to be "patently overbroad" because it prohibited disclosure of information "without regard as to whether such information was in any way proprietary or confidential in nature, or whether [the defendant] in fact obtained the information through a source outside of work".  Similarly, the court in *North American Paper Co. v. Unterberger*, 526 N.E.2d 621, 624 (Ill. App. Ct. 1988), concluded that the nondisclosure agreement, purporting "to protect virtually every kind of information that [defendant] learned during the period of his employment even if non-confidential," was void as a matter of law.

Yet, in both cases, the court was not confined to the pleadings, and the cases were resolved via summary judgment.  *See AssuredPartners*, 44 N.E.3d at 466, 468; *N. Am. Paper*,

---

[3] Contrary to the Defendants' suggestion, the court in *Coady* did not base its holding on the protection of trade secrets because the agreement defined as confidential "any and all information . . . concerning . . . the business activities."  *See Coady*, 719 N.E.2d at 247, 250.

[4] The confidentiality provisions define certain information as confidential regardless of whether it was *marked* as being "confidential," "proprietary," or "copyright" *at the time of disclosure*.  Docket Nos. 1-2, at 1; 1-3, at 3-4.  The provisions should not be construed to prohibit the use and disclosure of information regardless of whether or not it actually *is* confidential or proprietary.

526 N.E.2d at 622, 624.  Courts have therefore declined to follow *North American Paper* when considering the enforceability of restrictive covenants on the pleadings alone.  *See Nortek Products (Taicang) Ltd. v. FNA Group, Inc.*, No. 10 C 2813, 2012 WL 119618, at *2 (N.D. Ill. Jan. 17, 2012) (recognizing that the court in *North American Paper* "had before it evidence that demonstrated that the plaintiff had virtually no confidential information, and its competitors could develop all the information the plaintiff claimed was confidential").  While the court in *AssuredPartners* relied on *North American Paper* in finding a confidentiality provision "patently overbroad," evidence separate from the pleadings suggested that the defendant obtained some of the protected information from relationships that he established before his employment. *AssuredPartners,* 44 N.E.3d at 475-76.  So there was evidence demonstrating the over breadth of the provision as it prohibited the disclosure of information that the defendant did not learn as a direct result of his employment.

At this stage of the proceedings, however, there is no such evidence.  The Court has not been afforded the assistance of such a factually developed record.  And because the Court is not persuaded that the confidentiality provisions are on their face "patently unreasonable," it declines to hold them unenforceable on the pleadings alone.

### B.    The Validity of the Non-Competition and Non-Solicitation Provisions

Defendants also argue that the non-competition and non-solicitation provisions are facially invalid because they lack geographic and customer limitations.  Docket No. 55.  The enforceability of these two provisions is governed by separate inquiries.  Each will be considered in turn.

1.        **The Non-Solicitation Provisions**

"A covenant not to solicit does not require a geographic limitation, but it must be reasonably related to the employer's interest in protecting customer relations that its employees developed while working for the employer."  *Lawrence & Allen, Inc. v. Cambridge Human Res. Group, Inc.*, 685 N.E.2d 434, 441 (Ill. App. Ct. 1997).

The principal case in support of the Defendants' contention regarding the non-solicitation provisions is *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1148 (Ill. App. Ct. 1999).  That case held that "where an activity restraint, such as a covenant not to solicit, lacks *both* a geographic limitation and any qualifying language concerning the particular customers to which it applies, it is unreasonable."  719 N.E.2d at 1148.

While the non-solicitation provisions of the CPS Agreement lack a geographic limitation, there is language restricting the class of persons to which they apply.  For example, section 2.1.2 prohibits CPS from soliciting the services "of any TLS Associate[5] *with whom [CPS did] not currently have a relationship*" at the time the agreement was entered.  Docket 1-2 (emphasis added).  This qualifying language goes toward the *Eichmann* Court's concern that activity restraints are reasonably tailored to protect the employer's interest in "customer relations that its employees developed as a direct result of the employment."  *Eichmann*, 719 N.E.2d at 1147.  Because the agreement in *Eichmann* expressly prohibited competition with "any existing or future customer," the court interpreted it as also prohibiting solicitation of any customer— including future customers who were not yet identifiable.  *Id.* at 1148.  Therefore, the *Eichmann* Court did not find the class in that case "specific enough to be reasonable," but it acknowledged

_____

[5] By definition, "TLS Associate" encompasses "contractors, consultants, sales representatives, sales associates, subsidiaries, strategic partners, licensors, licensees, customers, prospective customers, suppliers, or other service providers or sources of supply including firms in which a principal, employee, officer director or owner of either Party may have an ownership interests."  Docket No. 1-2, at 1.

that "the determination of reasonableness necessarily depends on the unique facts and circumstances of each case." *Id.* at 1143, 1148.  This Court is not ready to make that determination today.[6]

As for the MFS Agreement, however, the non-solicitation provisions lack both a geographic limitation and a class restriction.  Sections 6.1.4 and 6.1.5 prohibit MFS from inducing any "TLS Resource"[7] to "terminate a relationship with, cease providing services or products to, or cease purchasing products or services from, TLS" and from hiring or using the services "of any TLS Resource."  Docket No. 1-3, at 4-5.  Still, it is not clear that this absence renders the provision "patently unreasonable."

In *Arpac Corp. v. Murray*, 589 N.E.2d 640, 649-50 (Ill. App. Ct. 1992), the court refused to invalidate a non-solicitation provision very similar to the one at hand.  The provision there prohibited the defendant from inducing "any employees, agents[,] or sales personnel of [the employer] to terminate any relationship with [it]."  *Arpac*, 589 N.E.2d at 645.  Based on evidence developed during a preliminary injunction hearing, the court found that the provision was "reasonably calculated to protect the employer's interest in maintaining a stable work force." *Id.* at 650.[8]

---

[6] Section 2.1.3 prohibits CPS from contracting with, recommending, or utilizing "any provider of legal services for legal and accounting strategies that have not been previously implemented by [CPS]" that were recommended by TLS.  Docket No. 1-2.  The Court also does not find this provision facially invalid.  *See Dam, Snell & Taveirne, Ltd. v. Verchota*, 754 N.E.2d 464, 470 (Ill. App. Ct. 2001) (concluding that a similar provision was not overly broad even though it did not limit the prohibition to clients that the defendant had contact with during her employment with the company).

[7] A "TLS Resource" is defined as "any employee, officer, director, agent, independent contractor, [c]onsultant, representative, strategic partner, licensor, licensee, [c]lient, supplier, TLS Affiliate, or other service provider of TLS."  Docket No. 1-3, at 4.

[8] *Arpac*'s holding has been disputed by several federal district courts.  *See Hay Group, Inc. v. Bassick*, No. 02 C 8194, 2005 WL 2420415, at *7 (N.D. Ill. Sept. 29, 2005); *YCA, LLC v. Berry*, No. 03 C 3116, 2004 WL 1093385, at *17 (N.D. Ill. May 7, 2004).  The most negative is *Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 983 (C.D. Ill. 2003), which characterized *Arpac* as "a misapplication of Illinois law" since an employer's interest in maintaining a stable work force is not a legitimate business interest.  But others have subscribed to the Illinois Appellate Court's reasoning in finding non-solicitation of employees covenants enforceable.  *See Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2010 WL 375672, at *10 (N.D. Ill. Jan. 26, 2010); *Malone v. Cort*

The Court considers *Arpac* persuasive, and will decline to invalidate the MFS non-solicitation provisions at this stage of the litigation.

## 2.    The Non-Competition Provisions

With respect to the geographic scope of a non-competition covenant, Illinois "courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business" when assessing reasonableness. *Cambridge Eng., Inc. v. Mercury Parts. 90 Bl, Inc.*, 879 N.E.2d 512, 523 (Ill. App. Ct. 2007). The purpose of this requirement is to stop the employee from competing "in the territorial zone in which relationships with the employer's customers could have been established in ways that could be detrimental in the hands of a competitor." *Id.* As the Plaintiff points out, Illinois courts have even approved non-competition covenants that lack geographic limitations when the employer's business activities are nationwide. *See Instrumentalist Co. v. Band, Inc.*, 480 N.E.2d 1273, 1281 (Ill. App. Ct. 1985).

This alone demonstrates that the absence of such a limitation in the CPS and MFS non-competition provisions does not conclusively render them facially invalid. Although Puerto Rico is TLS's principal place of business, the Plaintiff argues that the company's business activities are nationwide and somewhat international. Docket No. 53. The complaint supports this contention, to a certain degree, by alleging that some of the Defendants' wrongful conduct occurred in Florida and Mississippi when they were supposed to be acting on behalf of TLS.

---

*Furniture Corp.*, No. 02 C 1729, 2002 WL 1874819 (N.D. Ill. Aug. 13, 2002). Most recently, *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 786-87 (N.D. Ill. 2011), shed light on the state of the issue:

> If any consensus can be gleaned from the cases discussed above, it is that the interest in maintaining some stability within an employer's work force can be a legitimate business interest. In this, as in other contexts, the facts and circumstances will vary and will determine the necessity for and reasonableness of the restrictions imposed by the employer to protect that interest; blanket prohibitions will seldom be deemed necessary or reasonable.

804 F. Supp. 2d at 786-87.

Docket No. 1.  Whether or not TLS actually operates nationally is a question that can best be answered after discovery has been completed.  In other words, the facts and the circumstances need to be fleshed out.  *See Hamer Holding Group, Inc. v. Elmore*, 560 N.E.2d 907, 917 (Ill. App. Ct. 1990).

Lastly, the Defendants assert that the non-competition provisions are overly broad and facially invalid because they prohibit the Defendants from working in any capacity with a company that provides tax services.  *Kairies v. All Line, Inc.*, No. 2-11-1027, 2012 WL 6969667, at *5 (Ill. App. Ct. June 21, 2012) supports this assertion.  There the court invalidated a non-competition agreement on the pleadings alone because it prohibited the employer from working for a competitor even in a non-competitive capacity.  *Kairies*, 2012 WL 6969667, at *5.  But other courts have found this argument unpersuasive at the pleadings stage.  *See Allied Waste*, 177 F. Supp. 3d at 1110 (refusing to facially invalidate a non-competition agreement without considering the surrounding facts and circumstances).[9]

It seems that the more accepted and prudent practice is to wait until the factual context surrounding such covenants is fully developed before assessing reasonableness.  Therefore, the Court refuses to invalidate the non-competition provisions on the pleadings alone.

## IV.   Conclusion

The Plaintiff has stated a claim of relief that is plausible on its face.  The Defendants' motion for judgment on the pleadings is denied.

**SO ORDERED**, this the 30th day of November, 2016.

---

[9] The Defendants argue that reliance on *Allied Waste* is improper because the non-competition provision in that case contained a geographic and durational limitation.  Docket No. 55.  Although neither of the provisions at issue are limited geographically, both are limited in duration.  Docket Nos. 1-2; 1-3.  The Court finds it inappropriate to assess the weight that one fewer limitation has on the reasonableness of the covenants without also considering the surrounding facts and circumstances.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE