

———————————

No. 3:14-CV-881-CWR-LRA

TLS MANAGEMENT & MARKETING SERVICES, LLC,

*Plaintiff,*

*v.*

MARDIS FINANCIAL SERVICES, INC., *et al.,*

*Defendants.*

———————————

FINDINGS OF FACT & CONCLUSIONS OF LAW

———————————

Before CARLTON W. REEVES, *District Judge*.

TLS Management & Marketing Services, LLC filed this suit nearly four years ago, alleging that Defendants hatched a scheme to steal its trade secrets and launch a competing tax reduction business.[1] In January 2018, after finding that Defendants had destroyed evidence, the Court entered a default judgment against them under Federal Rule of Civil Procedure

---

[1] *Complaint*, Docket No. 1.

37(e)(2).[2] The Court then held a two-day bench trial on damages.

In the Fifth Circuit, "after a default judgment, the plaintiff's well-pleaded factual allegations are taken as true, except regarding damages . . . [and] personal jurisdiction."[3] A defendant "may not challenge the sufficiency of the evidence" in the wake of a default judgment.[4] But while a default judgment "conclusively establish[es] a defendant's liability,"[5] such liability exists "only so far as it is supported by well-pleaded allegations."[6] In other words, if a particular claim would not survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), there is no liability under that claim.[7] Therefore, despite the default judgment, the Court must determine if TLS's well-pleaded liability-related factual allegations, taken as true, establish liability.

The analysis begins with jurisdiction. The Court will then consider liability on a claim-by-claim basis, and assess damages under each claim. The analysis concludes with the questions of injunctive relief and attorney's fees.

---

[2] *Order,* Docket No. 187.

[3] *Jackson v. FIE Corp.,* 302 F.3d 515, 525 (5th Cir. 2002) (quotation marks omitted).

[4] *Wooten v. McDonald Transit Assocs., Inc.,* 788 F.3d 490, 496 (5th Cir. 2015).

[5] *Leedo Cabinetry v. James Sales & Distribution, Inc.,* 157 F.3d 410, 414 (5th Cir. 1998).

[6] *Wooten,* 788 F.3d at 496 (quotation marks omitted).

[7] *See id.* at 500.

# I

## Jurisdiction

***Subject Matter Jurisdiction.*** The Court has diversity jurisdiction under 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000.[8] TLS is a Puerto Rico business. J. Todd Mardis is a Mississippi resident. Capital Preservation Services and Mardis Financial Services list their principal places of business in Flowood, Mississippi.

***Personal Jurisdiction & Venue.*** The Court has personal jurisdiction over Defendants, given their places of residence and principal offices. For these same reasons, the Southern District of Mississippi is an appropriate venue for this action.

# II

## Liability

### A

#### Facts[9]

***TLS's Business.*** TLS provides businesses with customized strategies to reduce their taxes through a group of highly skilled tax attorneys and accounting professionals. TLS has designed custom made plans for more than 5,000 clients' businesses and individual needs, and through these efforts has developed substantial goodwill and a respected reputation in the industry.

---

[8] Given TLS's claim under federal trademark law, the Court also has federal question jurisdiction under 28 U.S.C. § 1331.

[9] Unless otherwise noted, the facts in this section are taken, with minor grammatical and formatting changes, from TLS's complaint.

***TLS's Confidential & Proprietary Information.*** The identity, contact information, and knowledge of particular needs of TLS customers ("Customer Information") are essential to TLS's business, and are considered by TLS to be confidential, proprietary information. Although certain information might be publicly available—such as a company's name or corporate mailing address—only a limited number of TLS employees and affiliates know who among the general public are TLS customers or prospects, and therefore have a specific need for tax consulting services. TLS also considers information about its marketing strategies, pricing, and other business-related information ("Business Information") to be confidential and proprietary.

TLS devotes significant time, effort, and capital to the development of its Customer Information and Business Information. TLS pays for subscription information services to enable it to stay up to date on the latest issues relevant to its tax planning advice. TLS employs at least one individual whose sole responsibility is to conduct and distill this research. TLS also employs two full-time employees devoted to marketing tasks, and invests heavily in branding and marketing efforts.

TLS has developed a lengthy document that thoroughly assesses a client's financial information and provides recommendations of potential avenues to achieve tax savings (the "Tax Report"). TLS developed and customized the Tax Report through the full-time efforts of several individuals that began before the inception of TLS's business in 2005 and continues to this day. The Tax Report contains methods that are unique to TLS and are not generally available in the industry. TLS's extensive experience with regard to tax reduction is reflected in the Tax Report, TLS analytical methods, TLS forms, and

TLS proposals to potential clients. TLS also devotes significant time, effort, and capital to following all developments in tax law and policy that might affect its strategies or its clients' needs, and uses that knowledge to constantly update the Tax Report.

***TLS's Efforts to Keep Information Confidential.*** TLS maintains its Customer Information and Business Information in confidence, both to preserve TLS's competitive advantage and to meet customer expectations that TLS will maintain sensitive information (such as the amount of money TLS was able to save a client in tax payments) in confidence. TLS vigilantly preserves its Customer Information and Business Information so that it does not become available to competitors who could use the data to divert customers without the investment of time, labor, and capital that TLS made to compile the information. TLS does not provide its Customer Information or Business Information to competitors. It requires individuals or entities who require access to TLS's Customer Information or Business Information to sign non-disclosure, confidentiality, and non-competition agreements before providing them with such access. Access to TLS's database containing all Customer Information is password-protected, and access permissions and methods are frequently reviewed and strictly enforced. The business derives substantial economic value from preserving its Customer Information and Business Information as confidential, keeps this information out of the hands of its competitors, and considers it a trade secret.

***Mardis & Capital Preservation Services.*** Todd Mardis, through his company Capital Preservation Services, learned about TLS's tax planning and consulting business after entering into a contract with TLS—the CPS Agreement—on June 9,

2010.[10] Mardis signed the contract on Capital Preservation Services' behalf. The CPS Agreement imposed duties of confidentiality and non-competition on the parties.[11]

TLS provided Capital Preservation Services and Mardis with TLS's Customer Information and Business Information pursuant to the protections of the CPS Agreement. TLS would not have provided Capital Preservation Services or Mardis with its Customer Information and Business Information without the agreement to protect the information and to refrain from competing with TLS.

As a result of its relationship with TLS, Capital Preservation Services has received commissions on sales from TLS and as a result of insurance policies sold to TLS clients. The sales of insurance policies are a direct result of a TLS client's implementation of the recommendations contained in the Tax Report. Therefore, without the TLS proprietary Customer Information, Business Information and Tax Report, TLS clients would have no reason to buy insurance policies from Capital Preservation Services.

The CPS Agreement was terminated on November 14, 2014.[12]

***Mardis & Mardis Financial Services.*** On February 28, 2011, TLS expanded its business relationship with Todd Mardis and his affiliated companies by entering into a subcontractor

---

[10] *CPS Agreement*, Plaintiff's Exhibit 2 at 1, 5. Defendants admit that TLS was a party to the CPS Agreement. *See Answer*, Docket No. 9 at 4 ("[T]he parties entered into the [CPS] Agreement[.]"); *Pretrial Order*, Docket No. 213 at 5 ("TLS entered into [the CPS Agreement.]").

[11] *CPS Agreement*, Plaintiff's Exhibit 2.

[12] *Bersin Report*, Plaintiff's Exhibit 5 at 11.

agreement with Mardis Financial Services.[13] The MFS Agreement was signed by Mardis and was jointly prepared by the parties, each of which was a sophisticated business.

The MFS Agreement allowed Mardis Financial Services to become responsible for gathering Customer Information from prospective TLS clients, applying proprietary TLS Business Information to analyze clients' tax situations, and developing and pricing TLS sales proposals. In addition, Mardis Financial Services became responsible for production of the Tax Report. Mardis Financial Services was given not only the Tax Report, but all TLS methods and procedures for customizing the Tax Report to specific client situations. As part of the agreement to assume these duties, Mardis Financial Services accepted duties of confidentiality and non-competition.[14]

In 2013, the parties amended the MFS Agreement to further expand their business relationship; the amendments did not alter the existing duties of confidentiality and non-competition.[15] TLS provided Mardis with additional, significant access to its confidential Customer and Business Information. Mardis received information about TLS's financial and business operations, including TLS's business profitability and external relationships.

---

[13] *MFS Agreement,* Plaintiff's Exhibit 3. Defendants admit that TLS is a party to the MFS Agreement. *See Answer*, Docket No. 9 at 5 ("[T]he parties entered into the [MFS] Agreement[.]"); *Pretrial Order*, Docket No. 213 at 6 ("[The MFS Agreement] was signed by [David] Runge for Tax Law Solutions, LLC, a Puerto Rico company[.]").

[14] *Id.*

[15] *Amendments to Second Contract*, Plaintiff's Exhibit 4 at 1, 3.

The MFS Agreement was terminated on September 26, 2014.[16] Mardis Financial Services failed to return to TLS all Confidential Information in its possession after the termination of the MFS Agreement.

***Defendants' Wrongdoing.*** In 2014, Defendants began secretly and deliberately building their own tax planning business using TLS resources, relationships, and intellectual property. That business directly competed with TLS and diverted customers from TLS. Defendants began diverting sales opportunities away from TLS and sold tax planning services on their own behalf to competitors during the spring and summer of 2014.

Defendants now compete with TLS in the market for tax reduction consulting services. Defendants are engaging in the business of providing tax consulting services similar to those provided by TLS and performing services for a competitor of TLS. Defendants are in possession of TLS's Confidential Information, and continue to use it for their own benefit to divert business away from TLS.

Defendants are intentionally confusing customers about the nature and source of their services, causing customers to believe that Defendants' services are provided through or on behalf of TLS. Defendants obtained permission from customers to use their names to endorse TLS services, then used the customers' names and comments to promote Defendants' services. Clients whom Defendants began soliciting while Mardis was still associated with TLS were not notified that work on their projects was no longer being performed by TLS.

---

[16] *Bersin Report,* Plaintiff's Exhibit 5 at 13.

Defendants have distributed advertisements and posted pages on its website which include false and misleading representations of fact.

**B**

**Analysis**

**1**

**Mississippi Uniform Trade Secrets Act**

The Mississippi Uniform Trade Secrets Act allows plaintiffs to "recover damages for misappropriation" of a trade secret,[17] and to obtain an injunction to prevent "[a]ctual or threatened misappropriation."[18] A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique or process, that: [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and [is] the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[19] One form of misappropriation is the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who," to "acquire knowledge of the trade secret," used "improper means," such as "theft, bribery, misrepresentation,

---

[17] *Damages*, Miss. Code Ann. § 75-26-7.

[18] *Injunctions; Protective Orders*, Miss. Code Ann. § 75-26-5.

[19] *Definitions*, Miss. Code Ann. § 75-26-3.

breach or inducement of a breach of a duty to maintain secrecy."[20]

Here, TLS provided Defendants with confidential and proprietary information about its business and customers. TLS derived independent economic value from the secrecy of this information. TLS engaged in reasonable efforts to maintain its secrecy, like forcing Defendants to sign non-disclosure agreements that required the return of all business and customer information at the conclusion of their business relationship. Such information constituted trade secrets.[21] Defendants willfully and maliciously misappropriated TLS's trade secrets by using and disclosing them without consent and in breach of existing duties of non-disclosure. The Court finds that Defendants are liable under the Trade Secrets Act. TLS is entitled to an injunction and damages for misappropriation.

## 2

### Tortious Interference with Business Relations

Tortious interference with business relations occurs when: "(1) the acts [of interference] were intentional and willful; (2) the acts were calculated to cause damage to the plaintiffs in their lawful business; (3) the acts were done with the unlawful

---

[20] *Id.*

[21] *See Tom James Co. v. Hudgins*, 261 F. Supp. 2d 636, 641 (S.D. Miss. 2003) (reviewing Mississippi law on what counts as a trade secret).

purpose of causing damage and loss without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) actual loss and damage resulted."[22]

Under this standard, Defendants are liable in tort for interference with business relations. Defendants intentionally interfered with TLS's business, stole trade secrets in order to effect that interference, and diverted customers from Defendants, causing actual loss. This interference was willful and malicious.

### 3

### Unfair Competition

In Mississippi, a person is liable in tort for unfair competition if they "set[] about to maliciously and wantonly injure a competitor" and cause such an injury.[23] While the Trade Secrets Act "displaces conflicting tort [ ] law of this state providing

---

[22] *PDN, Inc. v. Loring*, 843 So. 2d 685, 688 (Miss. 2003). These elements mirror those of the tort of tortious interference with contract. *See Cenac v. Murry*, 609 So. 2d 1257, 1268 (Miss. 1992). In the past, there has been some confusion about the distinctness of these two torts. *See Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998) ("According to *Cenac*, this Court intended there be different elements for interference with business relations and interference with contract, but in a later case this Court set out the same four elements for interference with a business relationship that apply to the separate tort of interference with contract."). Today, the Mississippi Supreme Court appears to address the torts as functionally identical. *See Springer v. Ausbern Constr. Co.*, 231 So. 3d 980, 985 (Miss. 2017*)* (quoting *Zumwalt v. Jones Cty. Bd. of Sup'rs*, 19 So. 3d 672, 688 (Miss. 2009) to discuss a "claim of tortious interference with business relations and/or contracts").

[23] *Cenac*, 609 So. 2d at 1269.

civil remedies for misappropriation of a trade secret,"[24] an unfair competition claim is "not . . . displaced" if it can "stand alone . . . without [a plaintiff] proving that [any relevant information] was a trade secret."[25]

In this case, TLS's unfair competition claim is not displaced. Even if TLS had not proven any theft of trade secrets, Defendants' appropriation of TLS's customer lists and misrepresentations to prospective customers were parts of a scheme to divert business from TLS. Such a scheme was a successful attempt to maliciously and wantonly injure a competitor. Defendants are liable in tort for unfair competition.

# 4

## Federal Trademark Law

Federal trademark law prohibits the use of a "false or misleading description of fact [that] . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of [one's] services."[26] Defendants' advertisements and webpages include false and misleading representations of fact since they misrepresented the nature of their business to their customers. Defendants are liable for violating the federal ban on false advertising.

---

[24] *Applicability of Chapter,* Miss. Code Ann. § 75-26-15.

[25] *Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc.,* 725 So. 2d 902, 908 (Miss. 1998).

[26] *False Designations of Origin, False Descriptions, and Dilution Forbidden,* 15 U.S.C. § 1125.

## 5

## Breach of Contract

*CPS Agreement.* Under the CPS Agreement, Capital Preservation Services was barred from disclosing "information regarding [TLS's] business" (including "information regarding business methods and procedures, clients or prospective clients, agent lists, marketing channels and relationships, marketing methods, costs, prices, earnings, products, formulae, compositions, methods, systems, procedures, prospective and executed contracts and other business arrangements") unless such disclosure was for "the purpose of carrying out [the CPS Agreement] and all other written agreements between the parties."[27] Upon termination of the CPS Agreement, Capital Preservation Services had a duty to "promptly retur[n]" all confidential information to TLS.[28] The CPS Agreement also barred Capital Preservation Services from, without prior written permission from TLS, "[b]ecom[ing] involved in the business of offering services substantially similar to any component" of TLS's business.[29] These duties of confidentiality and non-competition extended "during the term [of the CPS Agreement] and for a period of two years after [its] termination."[30]

The Court finds that Capital Preservation Services breached the CPS Agreement. By constructing a business founded on

---

[27] *CPS Agreement*, Plaintiff's Exhibit 2 at 1-2.

[28] *Id.* at 2.

[29] *Id.* at 2-3.

[30] *Id.* at 3.

TLS's trade secrets, disclosing those trade secrets to clients, and diverting customers from TLS, Capital Preservation Services willfully breached the duties of confidentiality and non-competition it had under the CPS Agreement.

***Mardis Financial Services.*** Under the MFS Agreement, Mardis Financial Services promised to keep confidential TLS's business information (including "information regarding clients or prospective clients, marketing channels and relationships, marketing methods, costs, prices, earnings, reports, products, formulae, compositions, methods, systems, procedures, reports, prospective and executed contracts and other business arrangement, and sources of supply").[31] Mardis Financial Services also agreed to "return to TLS any Intellectual Property of TLS still in [its] possession" upon the termination of the agreement.[32] Finally, Mardis Financial Services promised to not "engage in the business of providing any tax consulting services that are packaged, sold, delivered or implemented in a manner similar to the services provided by TLS" during the term of the MFS Agreement and for one year after the contract's termination.[33]

Mardis Financial Services breached the MFS Agreement. By constructing a business founded on TLS's trade secrets, disclosing those trade secrets to clients, and diverting customers from TLS, Mardis Financial Services willfully breached the duties of confidentiality and non-competition it had under the MFS Agreement.

---

[31] *MFS Agreement,* Plaintiff's Exhibit 3 at 3-5.

[32] *Id.*

[33] *Id.* at 4-5.

### III

### Damages

### A

### Preliminary Considerations

Defendants are liable to TLS under all the claims described above. While TLS is entitled to damages on each of these claims, it is not entitled to recover on each claim if that would constitute a "double recovery."[34] Plaintiffs "cannot recover the same damages twice, even though the recovery is based on two different theories."[35] Thus, TLS can only recover under separate claims to the extent each addresses different damages.

TLS submitted an expert report by Brett Bersin ("the Bersin Report") to calculate damages under its Trade Secrets Act and breach of contract claims.[36] His testimony was consistent with his report. Bersin is well-qualified. He has a B.B.A. degree in accounting from the University of Houston, is a Texas-licensed certified public accountant, is certified in financial forensics by the American Institute of Certified Public Accountants, and is a certified licensing professional.[37] At the time of his involvement in this case, Bersin was managing director of

---

[34] *R.K. v. J.K.*, 946 So. 2d 764, 777 (Miss. 2007); *see generally* Johnny C. Parker, *Miss. Law of Damages* § 1:9 (Oct. 2017).

[35] *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 441 (5th Cir.1987) (quoted in *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 725 (5th Cir. 2006)).

[36] *Bersin Report,* Plaintiff's Exhibit 5.

[37] *Bersin Report* at 1-2.

an international financial advisory consulting firm, Duff & Phelps.[38] Bersin is regularly retained to serve as an expert witness in cases involving forensic accounting and economic damages.[39]

The Bersin Report was based on a "review of the facts, documentary evidence produced in this lawsuit, deposition transcripts, data and information [on Defendants' businesses], interviews of TLS's personnel, as well as [Bersin's] business training and experiences."[40] It analyzed hundreds of Defendants' internal documents,[41] using profit and loss statements, customer detail reports, and vendor detail reports to calculate revenues and expenses.[42]

Defendants do not challenge Bersin's qualifications or expertise.[43] They also made the strategic choice to not submit any expert testimony rebutting Bersin's conclusions or presenting an alternative theory of damages.

---

[38] *Id.*

[39] *Id.* at Attachment 1.1; *Day 1 Trial Transcript,* Docket No. 208 at 15.

[40] *Bersin Report* at 3.

[41] *Id.* at Attachment 2.0.

[42] *Day 1 Trial Transcript*, Docket No. 208 at 48.

[43] *See id.* at 71-100 (Defendants' cross-examination of Bersin).

## B

## Analysis

## 1

## Trade Secrets Act

The Trade Secrets Act allows plaintiffs to recover "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."[44]

***Expert Report on Damages.*** The Bersin Report quantified Defendants' damages under the Trade Secrets Act as "profits from [their] alleged unauthorized use of [trade secrets] for the period of September 2014 through October 2017 (date of trial)."[45] Bersin began this unjust enrichment calculation by using Defendants' total revenues as a baseline.[46] He subtracted from this revenue all "incremental expenses directly related to the production of [their] revenue from [misappropriation]."[47] Following Fifth Circuit guidance on calculating unjust enrichment,[48] Bersin excluded from his calculations

---

[44] *Damages*, Miss. Code Ann. § 75-26-7.

[45] *Bersin Report* at 22-23.

[46] *Day 1 Trial Transcript*, Docket No. 208 at 81.

[47] *Bersin Report* at 22-23.

[48] *See* George P. Roach, *Counting the Beans: Unjust Enrichment and the Defendant's Overhead*, 16 TEX. INTELL. PROP. L.J. 483, 485 (2008) (citing *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 585 (5th Cir. 1980)). Bersin chose to follow Fifth Circuit guidance because, as he correctly notes, "[if] you look at the [Trade Secrets Act] . . . [i]t doesn't specifically tell you

what he identified as variable and semi-variable expenses, and included what he identified as fixed costs.[49] Bersin's methodology was simple: Total Revenue − Incremental Expenses = Profit = Unjust Enrichment.[50]

When calculating the unjust enrichment of Capital Preservation Services, Bersin examined the company's financial statements and Todd Mardis's deposition testimony.[51] Bersin identified four categories of incremental expenses: *commissions*, which were "contractual amounts paid to advisors for their client-related work"; *marketing expenses*, which were "amounts expended to advertise . . . business services and generate client work"; *marketing and related fees*, which were "agreed upon amounts paid to medical associations in connection with . . . marketing efforts to its members"; and *professional fees*, which were "amounts paid to [lawyers] for tax

---

what expenses are deducted to get to profit." *Day 1 Trial Transcript*, Docket No. 208 at 46.

[49] Bersin testified that variable expenses are "expenses that directly vary with each sale," like insurance placement fees. *Day 1 Trial Transcript*, Docket No. 208 at 43. Semi-variable expenses are expenses incurred to "produce the revenue, but . . . not necessarily [ ] incurred with each and every sale," such as "marketing expenses overall to generate revenue." *Id*. at 43-44. Fixed costs are "fixed expenses" like "office rent, property taxes, life insurance, [and] computer rentals." *Id*. Bersin found that Defendants' fixed costs were "a very limited amount of expense overall." *Id*. at 50.

[50] *Id*. at 42-43 ("BERSIN: . . . I understand under the Mississippi trade secrets statute as well as governing case law, I am to identify not accounting net income but . . . the specific expenses that are incremental or . . . directly tied to the production of the revenue at issue.").

[51] *Bersin Report* at 22.

work performed for . . . clients."[52] Subtracting these expenses from Capital Preservation Services' total revenues for the relevant time period, Bersin calculated the profits unjustly earned by the firm as $2,482,221.57.[53]

Bersin took a similar approach to calculating the unjust enrichment of Mardis Financial Services. Bersin identified two categories of incremental expenses: *commissions* and *marketing expenses*.[54] Subtracting these expenses from Mardis Financial Services' total revenues for the relevant time period, Bersin calculated the profits unjustly earned by the firm as $1,025,496.91.[55]

***Objections to Expert Report.*** Defendants made four objections to Bersin's methodology. None are persuasive.

First, Defendants say Bersin was wrong to assume that all of their revenue during the relevant time period stemmed from the use of trade secrets.[56] Defendants argue that as much as 25% of the profits identified by Bersin were unrelated to stolen trade secrets, pointing to Todd Mardis's testimony that some of his business stemmed from an "audit defense plan" not offered by TLS.[57] If these audit defense services were un-

---

[52] *Id.*

[53] *Id.* at 22, Exhibit 1, Exhibit 3.

[54] *Id.* at 23.

[55] *Id* at 23, Exhibit 1, Exhibit 5.

[56] *Defendants' Proposed Findings of Fact* at 13.

[57] *Defendants' Proposed Findings of Fact* at 9, 20 (citing *Day 2 Trial Transcript*, Docket No. 208 at 66-67).

related to tax planning, Defendants' argument might be persuasive. But Defendants' audit defense "services" were simply biannual meetings with tax planning clients to "review their documentation" and "make adjustments if there [were] changes to the tax code."[58] Thus, these services were a part of the tax planning business built on stolen trade secrets.

Defendants' second objection is that Bersin used Defendants' profit and loss statements, rather than their allegedly more accurate tax returns, to calculate the relevant revenue streams. This argument is meritless. As Bersin testified, it makes no difference if he "looked at the tax returns versus the profit and loss statements," as the latter statements "form the basis for the tax returns."[59] Defendants allude to "substantial adjustments" made on the tax returns that render prior filings inaccurate.[60] Bersin, however, testified that the tax returns reflect no such adjustments, and were instead "more or less the same" as the profit and loss statements.[61] To dispute this claim, Defendants have submitted their raw tax returns as evidence, hoping the Court will both conduct its own analysis and weigh it against Bersin's methodology. The Court must decline this invitation to perform forensic financial accounting. The expert is far more capable. The profit and loss state-

---

[58] *Day 2 Trial Transcript*, Docket No. 208 at 66-67.

[59] *Id.* at 82.

[60] *Id.* at 84-85.

[61] *Id.* at 88.

ments are far more detailed assessments of Defendants' business operations, and there is no reason to believe the tax returns better capture those operations.[62]

Defendants' third argument is that Bersin used a flawed methodology for deducting business expenses. The only evidence to support this claim is the testimony of Todd Mardis, who performed a different set of deductions when filing Defendants' tax returns.[63] But Mardis admits that he has "no expertise" when it comes to forensic accounting.[64] His testimony is no basis for challenging Bersin's methodological choices regarding deductions.

Defendants' final objection involves an alternative measure of damages under the Trade Secrets Act. The Act says that "[i]n lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."[65] Defendants argue that, because a valuation report of TLS's business showed that the firm paid $139,574 in royalties in 2010, that royalty figure should serve as the measure of damages.[66]

---

[62] *See also id.* at 105-45 (testimony suggesting that Defendants underestimate their wealth on personal financial statements by using questionable valuation methods and omitting assets).

[63] *Id.* at 79-91.

[64] *See id.* at 121-22.

[65] *Damages*, Miss. Code Ann. § 75-26-7.

[66] *Defendants' Proposed Findings of Fact* at 21; *2013 Valuation Report of Tax Law Solutions, LLC Consulting Division,* Defendants' Exhibit 7.

Defendants mischaracterize the evidence. The valuation report merely indicates that payment involved *some* intellectual property.[67] Defendants have submitted no evidence proving that the royalty figure involved any (let alone all) of the trade secrets at issue here. It is also unclear if the 2010 royalty payment was for a month's worth of use or for a year's worth of use.[68] Indeed, during the year prior, TLS paid $374,414 in royalties, suggesting that the royalty figures vary based on scope of use.[69] There is simply not enough evidence to support Defendants' royalties-as-damages theory.

In sum, the Court finds no reason to reject Bersin's conclusions about an appropriate damages award under the Trade Secrets Act. TLS is entitled to recover the damages described therein.

## 2

## Tort Claims

Tortious interference with business relations allows a plaintiff to recover their actual losses stemming from such interference.[70] Actual loss must be measured using a "reasonable basis for computation" that results in a "fair approximate estimate of loss"—that is, a "methodology" that is more than

---

[67] *2013 Valuation Report of Tax Law Solutions, LLC Consulting Division*, Defendants' Exhibit 7 at 8, Exhibit 2.

[68] *Id.*

[69] *Id.*

[70] *Loring*, 843 So. 2d at 688.

"mere speculation."[71] TLS has submitted no methodology to measure its actual losses, so it cannot recover under this claim.

For the same reason, TLS cannot recover under its claim for unfair competition, which also measures damages through actual loss.[72]

## 3

### Federal Trademark Law

Federal trademark law allows a plaintiff to recover "defendant's profits" and "any damages sustained by the plaintiff" stemming from any deceptive advertising practices.[73] TLS has offered no calculation to establish what fraction of Defendants' profits are traceable to deceptive advertising practices. Whatever the fraction is, those damages are co-extensive with those under the Trade Secrets Act, which include *all* of Defendants' profits. The co-extensive nature of these damages means that TLS cannot have a separate recovery under federal trademark law.

---

[71] *Par Indus., Inc..*, 708 So. 2d at 50; *see also* Parker, *supra* at § 35:31 ("In the context of tortious interference with business relations, the plaintiff must provide hard proof of financial loss. Speculative loss will not suffice.").

[72] *Memphis Steam Laundry-Cleaners v. Lindsey*, 5 So. 2d 227, 230 (Miss. 1941).

[73] *Recovery for Violation of Rights*, 15 U.S.C. § 1117; *False Designations of Origin, False Descriptions, and Dilution Forbidden*, 15 U.S.C. § 1125.

# 4

## Breach of Contract

Both the CPS Agreement and the MFS Agreement are governed by Illinois law.[74] In Illinois, "[d]amages recoverable under a breach of contract theory are . . . [the] amount that will put [a plaintiff] in as good a position as [they] would have been in had the contract been performed as agreed."[75] Such damages "may be liquidated in the agreement," but only for an amount that is "reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss."[76] However, liquidated damages that are "unreasonably large" are "unenforceable on grounds of public policy as a penalty."[77]

TLS has not pursued expectancy damages for breach of contract. Instead, it has sought to recover through the liquidated damages provisions within the CPS Agreement and the MFS Agreement. The Bersin Report includes calculations for these liquidated damages.[78]

---

[74] *CPS Agreement*, Plaintiff's Exhibit 2 at 5; *MFS Agreement,* Plaintiff's Exhibit 3 at 8; *see also Plaintiff's Memo in Opposition to Defendants' Motion for Judgment on the Pleadings,* Docket No. 53 at 5-6 (admitting that the MFS Agreement is governed by Illinois law, as that is where TLS is domiciled).

[75] *Collins v. Reynard*, 607 N.E.2d 1185, 1186 (Ill. 1992).

[76] *H & M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc.*, 805 N.E.2d 1177, 1188 (Ill. 2004).

[77] *Id.*

[78] *Bersin Report* at 24-28.

***CPS Agreement.*** The CPS Agreement's liquidated damages provision allows TLS to recover "all consideration" that Capital Preservation Services received "in relation to [a] breach," or "any consideration to which TLS would otherwise have been entitled to receive, whichever is greater."[79] In other words, the CPS Agreement offered TLS a choice between recovering for either actual loss or unjust enrichment. When offered the same choice through its Trade Secrets Act claim, TLS chose unjust enrichment. Its damages under that claim overlap with those flowing from Defendants' violation of the Trade Secrets Act. The co-extensive nature of these damages means that TLS cannot recover separately under the liquidated damages provision of the CPS Agreement.

***MFS Agreement.*** The MFS Agreement allows TLS to recover "150% of all fees collected" by Mardis Financial Services as a result of "any breach . . . and any fees which TLS would have otherwise been entitled to receive."[80] In other words, in the case of breach, the MFS Agreement allowed TLS to recover for both actual loss *and* 150% of Mardis Financial Services' unjust enrichment. Such damages extend beyond those recoverable under the Trade Secrets Act, and may be recovered separately by TLS.

Despite the fact that these sophisticated parties freely and voluntarily agreed to the MFS Agreement's terms, the Court finds that the contract's liquidated damages are unreasonably large. They are not reasonable approximations of the damages TLS would suffer in the event of breach. As an unenforceable

---

[79] *CPS Agreement,* Plaintiff's Exhibit 2 at 3-4.

[80] *MFS Agreement,* Plaintiff's Exhibit 3 at 7.

penalty, the MFS Agreement's liquidated damages provision cannot serve as a basis for recovery.

TLS has offered no measure of expectancy damages it would be entitled to under the MFS Agreement. The Court will assume that, whatever those damages are, they overlap with the damages stemming from Defendants' violation of the Trade Secrets Act. Therefore, there will be no separate recovery for breach of contract damages under the MFS Agreement.

## C

### Joint & Several Liability

Mississippi law imposes joint and several liability on all who "consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it."[81] Defendants' actions fall under the broad category of wrongs Mississippi has decided should be redressed through joint and several liability.

It is true that the Trade Secrets Act does not expressly provide for joint and several liability. The parties have not submitted any Mississippi or federal caselaw discussing the question of joint and several liability under the Act. Still, the Court believes that joint and several liability is appropriate. As the Seventh Circuit has held, the general rule is that "the principle of joint and several liability . . . governs . . . the common law tort of misappropriation of trade secrets."[82] There is no evi-

---

[81] *Joint Tort-feasors; Nature of Liability,* Miss. Code Ann. § 85-5-7.

[82] *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 877 (7th Cir. 2004).

dence that, in passing the Trade Secrets Act, Mississippi intended to abrogate this rule. Joint and several liability is appropriate here.

## D

### Punitive Damages

Under the Trade Secrets Act, an award for "exemplary damages" is appropriate when "willful and malicious misappropriation exists."[83] Defendants' conduct was, as noted above, willful and malicious. However, the Court is unconvinced that a substantial punitive damages award is necessary. The purpose of punitive damages in Mississippi is "to punish."[84] The default judgment and the size of the damages award are punishment enough. The Court will impose a punitive damages award of $100.

## E

### Prejudgment Interest

In a diversity case like this one, "state law generally controls the award of interest."[85] In Mississippi, while "judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt . . . [a]ll other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the

---

[83] *Damages,* Miss. Code Ann. § 75-26-7.

[84] *State Farm Mut. Auto. Ins. Co. v. Daughdrill,* 474 So. 2d 1048, 1052 (Miss. 1985).

[85] *Plantation Key Developers, Inc. v. Colonial Mortg. Co. of Indiana,* 589 F.2d 164, 170 (5th Cir. 1979).

filing of the complaint."[86] Moreover, this interest can be "compound[ed]" in order to "fully compensate a party for the time value of the overdue money."[87] Judgments awarded in Mississippi trade secrets cases may include prejudgment interest.[88] However, Mississippi "require[s] that a party assert a demand for prejudgment interest in the appropriate pleading."[89] The question is whether TLS has made such a demand.

In the Fifth Circuit, "while the substantive questions of entitlement to interest and the rate of interest are to be resolved by the applicable state law, the adequacy of a plaintiff's pleadings must be resolved by reference to [federal law]."[90] Here, although TLS's complaint does not specifically request prejudgment interest, it does request "other and further relief as the Court deems just and proper."[91] "[T]his statement," ac-

---

[86] *Rate of Interest on Judgments and Decrees*, Miss. Code Ann. § 75-17-7.

[87] *In re Guardianship of Duckett*, 991 So. 2d 1165, 1183 (Miss. 2008).

[88] *See, e.g., Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.*, 725 So. 2d 902, 921 (Miss. 1998).

[89] *Upchurch Plumbing, Inc. v. Greenwood Utilities Comm'n*, 964 So. 2d 1100, 1118 (Miss. 2007). This mirrors the Fifth Circuit rule that, in cases involving a default judgment, "a failure to request prejudgment interest . . . will cut off [that] relief upon default." *Ditech Fin., L.L.C. v. Naumann*, No. 17-50616, 2018 WL 3492001, at *4 (5th Cir. July 19, 2018).

[90] *Hamman v. Sw. Gas Pipeline, Inc.*, 821 F.2d 299, 308 (5th Cir.).

[91] *Complaint*, Docket No. 1 at 26.

cording to the Fifth Circuit, "suffices to plead a claim for pre-judgment interest."[92] Thus, to fully compensate TLS, prejudgment interest is appropriate.

In Mississippi, "a prejudgment interest rate of 8% per annum compounded annually has been held appropriate."[93] Defendants have not suggested an alternative rate of prejudgment interest, and the Court concludes that 8% is an appropriate rate. Prejudgment interest will begin with the date the suit was first filed, less certain deductions discussed below. The Court can and will take judicial notice of the calculations necessary for prejudgment interest.[94]

In the absence of deductions, interest would have accrued from the filing of this case on November 13, 2014 through to-day, August 3, 2018. Some of the time incurred in getting to final resolution of this case, though, will be ascribed to the Court. Specifically, Defendants will not be held responsible for a total of 707 days that passed as this Court was considering a series of dispositive motions.[95] Equity requires no less.

---

[92] *Fed. Sav. & Loan Ins. Corp. v. Texas Real Estate Counselors, Inc.*, 955 F.2d 261, 270 (5th Cir. 1992); *see also Perez v. Bruister*, 54 F. Supp. 3d 629, 680 (S.D. Miss. 2014), *aff'd as modified*, 823 F.3d 250 (5th Cir. 2016).

[93] *Perez*, 54 F. Supp. 3d at 680 (citing *Legal Rate of Interest; Finance Charges*, Miss. Code Ann. § 75-17-1).

[94] *See id.*

[95] Defendants filed a Motion to Dismiss, or in the Alternative, to Stay Proceedings on December 8, 2014. Docket No. 10. Briefing on that motion was completed on January 16, 2015. Docket No. 16. The Court issued its ruling on December 17, 2015. Given this period, 335 days will not be used to calculate prejudgment interest.

The final prejudgment interest award is $516,945.54.[96]

## IV

## Injunctive Relief

TLS has requested injunctive relief under the Trade Secrets Act, which allows injunctions to protect trade secrets and prohibit use of those secrets.[97] To obtain such relief, the Supreme Court has held that a plaintiff "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity

---

Similarly, CPS filed a Motion for Judgment on the Pleadings on July 1, 2016. Docket No. 48. Briefing on that motion was complete on July 22, 2016, Docket No. 55, and the Court ruled on the motion on November 30, 2016, Docket No. 104. Accordingly, the Court will subtract 131 days from the prejudgment interest period.

Finally, TLS's Motion for Default Judgment was filed on June 2, 2017, Docket No. 129, and briefing on that motion was completed on September 15, 2017, Docket No. 162. The Court issued its ruling on January 29, 2018, 241 days later. Docket No. 187.

[96] The Court used a common formula for calculating the prejudgment interest award. That formula, based on that within Robert J. Sergesketter, *Interesting Inequities: Bringing Symmetry and Certainty to Prejudgment Interest Law in Texas*, 32 Hous. L. Rev. 231, 270 n. 145 (1995), is: Principal Amount $\times$ $((1 + \text{Interest Rate})^{\text{Number of Compounding Periods}}$ - 1) = Prejudgment Interest Award. Applied here, that formula results in the following equation: $\$3,507,718.48 \times ((1 + .08)^{((1359-707)/365)}) - 1) = \$516,945.54$.

[97] *Injunctions; Protective Orders*, Miss. Code Ann. § 75-26-5. The same power lies within federal trademark law, *see Injunctive Relief*, 15 U.S.C. § 1116(a), and the Court's equitable powers, *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[98]

The first two requirements are met because Defendants' misuse of TLS's trade secrets and misrepresentations to clients have caused "damage to the goodwill of [a plaintiff's] customers," which amounts to an irreparable injury in this circuit.[99] Furthermore, Defendants' breach of their duties of confidentiality have "no cure" at law.[100] The third requirement is met because the balance of hardships between TLS and Defendants weighs in favor of an equitable remedy. Defendants have ample experience in tax planning services, and will be able to profitably continue their business without utilizing TLS's trade secrets or misleading customers about the nature of their services. Finally, an injunction will serve the public interest by promoting fair competition and discouraging theft of trade secrets.[101]

While TLS is entitled to an injunction, its current request for injunctive relief is overbroad. Given the nature of the default judgment, the Court is concerned that a broad injunction against the use of all TLS trade secrets will lead to satellite litigation over the injunction's applicability to specific busi-

---

[98] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).

[99] *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

[100] *ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) (quotation marks omitted).

[101] *See Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 273 (5th Cir. 2014).

ness information. The Fifth Circuit has warned about over-broad injunctions in trade secrets cases, and has advised district courts to issue injunctions that "enumerat[e] the trade secrets [that a defendant is] enjoined from using."[102] The irreparable injuries in this case stem from Defendants' misrepresentation of their ties to TLS and their misappropriation of TLS's Tax Report. Injunctive relief will be narrowly tailored to address these harms.

Therefore, pursuant to Federal Rule of Civil Procedure 65, the Court PERMANENTLY ENJOINS Defendants, their agents, their principals, and their affiliates from (1) using, disclosing, transmitting, or possessing any versions or derivations of TLS's Tax Report and (2) linking their business activities to TLS or otherwise misrepresenting their affiliation with TLS.

# V

## Attorney's Fees

Under the Trade Secrets Act, an award for "reasonable attorney's fees" is appropriate when "willful and malicious misappropriation exists."[103] The Court finds that such an award is appropriate here. However, the Court will defer entry of an award until the completion of post-judgment fees briefing, as

---

[102] *Id.*

[103] *Attorney's Fees for Prevailing Party,* Miss. Code Ann. § 75-26-9. Attorney's fees are also available under: (1) Mississippi law, given the award of punitive damages, *see Fulton v. Mississippi Farm Bureau Cas. Ins. Co.,* 105 So. 3d 284, 287 (Miss. 2012); (2) federal trademark law, *see Recovery for Violation of Rights,* 15 U.S.C. § 1117; and (3) Illinois contract law, *see Douglas v. Dep't of Conservation of the State of Ill.,* 32 Ill. Ct. Cl. 113, 115 (1977).

"the pendency of a ruling on an award for fees and costs does not prevent, as a general rule, the merits judgment from becoming final for purposes of appeal."[104]

## VI

### Conclusion

Defendants are jointly and severally liable to TLS for $3,507,718.48 in compensatory damages, $100 in punitive damages, and $516,945.54 in prejudgment interest, for a total award of $4,024,764.02. Defendants, their agents, their principals, and their affiliates are enjoined as set forth above. A final judgment in accordance with this decision will be entered this day.

SO ORDERED, this the 3rd day of August, 2018.

s/ CARLTON W. REEVES
*United States District Judge*

---

[104] *Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers*, 571 U.S. 177, 179 (2014).